JOHNSON, Dative Testamentary Executor *v.* WATERS, Administrator.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF LOUISIANA.

Argued October 16th, 17th, 1883.—Decided May 5th, 1884.

*Donation (inter vivos), (mortis causâ)—Equity—Jurisdiction—Parties—Pleading—Prescription.*

In Louisiana a donation to take effect at the death of the donor, so far as it is gratuitous, is a donation *mortis causâ*, which can be made only by will and testament, or by an instrument clothed with the forms required for validity as such, and clearly showing by its provisions that it is a disposition by will.

In Louisiana a donation of land *inter vivos*, reserving the use to the donor until his death, is void if made without consideration :—if made with a partial consideration, the value of the object given exceeding by one-half or more that of the charges or services – *quære* whether the gift will not be of a mixed nature, one part sale and valid, and one part donation and invalid.

A Circuit Court of the United States has jurisdiction in equity of proceedings under a bill filed by a creditor of the estate of a deceased person to set aside for fraud a sale of the real estate of the deceased which was made and confirmed by order of a State court having competent jurisdiction, when the inquiry is not into irregularities of proceeding in the other court, but into actual fraud in obtaining the judgment or decree of sale and confirmation.

A creditor of the estate of a deceased person may maintain an independent suit in Equity to set aside for fraud a sale of real estate of the deceased made under order of Court, though a party to the proceedings, if he was no party to the fraud, and was ignorant of it until after confirmation or homologation of the sale, and no question about it was before the court which confirmed the sale and passed upon the executor's accounts.

In Louisiana the acknowledgment of a succession debt by an executor or administrator, and the ranking of it by the judge in the manner provided by the Code of Practice, suspend the prescription.

A complaint which sets forth as cause of action a subject which is prescribed, without setting forth the matter which takes it out of the prescription, may be amended so as to set that matter forth, if the answer admits its truth.

A defective description of the representative capacity of a defendant in the subpœna which summons him in is cured if he is properly described in the bill, and if he appears, even by the defective title, and answers generally without objection.

In a creditor's bill, brought on behalf of the plaintiff and such other creditors as may become parties, it is error in granting relief to confine it to the creditor complaining. The usual and correct practice is, by means of a reference to a master, to give to all valid creditors an opportunity to come in and have the benefit of the decree.

On the facts in this case the sale of the testator's real estate made by order of a Parish court in Louisiana, and confirmed by that court, is void for fraud as against *bonâ fide* creditors.

The facts are stated in the opinion of the court.

*Mr. John A. Campbell* for appellants.

*Mr. Henry B. Kelly* and *Mr. Julius Aroni* (*Mr. Henry L. Lazarus* and *Mr. John G. Simrall* were with them) for appellee.

Mr. JUSTICE BRADLEY delivered the opinion of the court.

This suit was commenced by a creditor's bill filed by William Gay, a citizen of Kentucky, on behalf of himself and all other creditors of Oliver J. Morgan, late of Louisiana, deceased, against Oliver T. Morgan, his testamentary executor, John A. Buckner, Ferdinand M. Goodrich, Edward Sparrow, and J. West Montgomery, citizens of Louisiana.

The bill alleges that Oliver J. Morgan, at the time of his decease (which occurred in October, 1860), was indebted to the complainant and to divers other persons; that he owed the complainant $33,250, for which he had given him three drafts or bills of exchange; one for $13,000, dated January 7th, 1860, payable twelve months after date; one for $10,250, dated February 2d, 1860, payable 13th January, 1861; and one for $10,000, dated February 10th, 1860, payable 25th January, 1861; all of which were unpaid at maturity, and were duly protested; and that on the 23d day of December, 1870, the complainant obtained judgment in the Circuit Court of the United States for the District of Louisiana against the succession of the deceased, for the amount of the drafts and interest thereon, which judgment it is alleged has never been paid.

The main object of the bill is to set aside as fraudulent and void certain sales of the testator's lands made by the testamentary executor in January, 1869, to the defendants, Buckner, Montgomery and Goodrich, and to have the said lands resold in due course of administration for the purpose of paying the debts of the complainant and the other creditors, and for an account of assets and debts, an injunction and a receiver.

It is alleged in the bill, amongst other things, that, at the time of his decease, Oliver J. Morgan was the owner of a large estate, valued at nearly a million of dollars, consisting mostly of lands, abundantly sufficient, if honestly applied, to pay all his debts; but the bill charges, in substance, that the defendants have fraudulently combined to defeat the claims of the creditors by procuring the sale which is sought to be set aside. It is stated that this sale was made under an order of the Probate Court of the Parish of Carroll (where the lands are situated) on application of Buckner, as guardian of his daughter, and of the executor; the petition being signed by the other defendants as attorneys, and untruly representing that the lands were unproductive, and that it was necessary to sell them all to pay the debts of the estate. It is further stated that a simultaneous order was made, on the application of Oliver T. Morgan as executor of the will of Julia Morgan (adverse to and irreconcilable with his duties and trust as executor of Oliver J. Morgan), for the sale of three-fourths of the same lands as belonging to the estate of Julia Morgan; and that the sale was made under both orders. It is also stated that, before the sale, the confederates procured a false and fraudulent appraisement of the lands to be made at $2.75 per acre, reducing the whole value thereof to $43,205.25, instead of $947,153.80, at which they had been correctly appraised in the inventory. It is further stated that, at the sale, Buckner became the purchaser of 9,171 acres of the lands at $3 per acre; Montgomery, of 5,040 acres, and Goodrich, of 1,500 acres, at the same price; and it is charged that this price was grossly inadequate, and that the sale was a sham sale, intended as a means of securing the lands to the benefit of the family, and of cheating and de-

frauding the creditors. Various allegations are contained in the bill tending to establish the charge of fraud.

The defendants filed separate answers, denying generally the charges of fraud, and setting up various matters in explanation of the sale complained of, and in opposition to the equity of the bill.

They concurred in admitting the plaintiff's demand, and the recovery by him of a judgment thereon in the Circuit Court of the United States; but say that the judgment was allowed to be taken by an arrangement between the attorneys of plaintiff and defendant that the plaintiff, Gay, should acquiesce in the provision made for the creditors at the sale complained of, which provision was the purchase at said sale, by the defendant Montgomery, of 5,040 acres of land for the common benefit of the creditors; in making which arrangement, they allege that E. D. Farrar acted as attorney for Gay, and Edward Sparrow for the estate.

They also admitted the various appraisements made in 1860 and 1868; but deny that the latter was a false appraisement, or that it was procured by fraud; and referred to various circumstances in explanation of the great depreciation of the land at the latter period, such as the depressed and unsettled state of the country, the uncertainty of labor, and the high rate of taxation.

All the answers rely upon the regularity and validity of the mortuary proceedings in which the sale was made; and for the purpose of showing that as much was done for the creditors as could fairly have been demanded, they place great stress upon the alleged fact that three-fourths of all the lands sold belonged to the succession of Julia Morgan, the deceased daughter of Oliver J. Morgan, and wife of Oliver T. Morgan, and not to the succession of Oliver J. Morgan; and also upon another alleged fact, that John A. Buckner, as tutor of his daughter, had a mortgage lien, or privilege, on the whole property for more than $100,000, which (as they contended) was more than the whole property could possibly have produced at the time of the sale.

If these statements were true, they would go far to remove

the imputation of fraud in the proceedings complained of ; for there would have been no motive for fraud if the just rights of the heirs precluded the possibility of a surplus · for the general creditors. . The matter will be better understood, however, by a short history of Oliver J. Morgan's estate.

His wife, Narcissa Deeson, had died in 1844, leaving two children by him, namely, Julia and Ann. Julia married, first, one Keene, by whom she had several children ; and, secondly, Oliver T. Morgan (a nephew of Oliver J.), by whom she had a daughter. Ann married a Mr. Kellam, by whom she had a son, Oliver H. Kellam ; and the latter had a son, Oliver H. (whom, for convenience, we will call Oliver H. Kellam, Junior), and died leaving a widow, Melinda M., and his infant son, Oliver H., Jr. Thus Oliver H. Kellam, Jr., became sole heir of his grandmother, Ann, and was himself represented by his mother, Melinda, as his natural tutrix. Melinda afterward married John A. Buckner, and by him had a daughter.

Oliver J. Morgan (sometimes called General Morgan), had a large landed estate, situated on the Mississippi River, in Carroll Parish, La., consisting of five plantations contiguous to each other, Albion and Wilton in the centre, Melbourne to the southeast, down the river, and Westland and Morgana to the west and northwest, amounting altogether to over 15,000 acres of land, much of it rich cotton land. He also had a large number of slaves, and considerable movable estate. The greater part of this property was community property ; but some of it had been · acquired after the wife's death. Only one-half of the community property belonged to Oliver J. Morgan ; the other half belonging to his two daughters as heirs of their mother. Ann having died, her share was inherited by her grandson, Oliver H. Kellam, Jr.

In 1857 Oliver J. Morgan filed a petition in the District Court of Carroll Parish for a partition of the estate. An inventory was taken, answers were filed by Julia Morgan (who was then living), and by Melinda M. Kellam, as tutrix of her minor son, and evidence was taken as to the amount of improvements. The slaves were inventoried at $125,715.60, and were divided between the parties. The lands were inventoried, but the

appraisers reported that they could not be conveniently divided, and recommended that they should be sold. An order of sale was accordingly made, and the sale took place January 18th, 1858, and Oliver J. Morgan himself purchased all the lands for $362,201.80. The value of his improvements was appraised at $92,219, leaving a balance of $269,982.80, the one-half of which, $134,991.40, belonged to the heirs.. One-half of this sum, or $67,495.70, was due to Julia Morgan, and the other half to the minor, Oliver H. Kellam, Jr. Although the sale was for cash, no money was paid. Julia Morgan and her husband, Oliver T. Morgan, executed a request that the money coming to her should be left in her father's hands; and Mrs. Kellam acquiesced in the same course with regard to the share of her infant son. Thus Oliver J. Morgan became absolute owner of the whole landed property, but was indebted to his daughter, Julia, and to his great-grandson, Oliver H. Kellam, Jr., each in the sum of $67,495.70. A certificate of the sale, signed by the sheriff and O. J. Morgan, was filed in the court, as part of the proceedings in the cause, stating the fact that the money was not paid, but remained in O. T. Morgan's hands.

By virtue of this sale a vendor's privilege arose in favor of the heirs; but it is declared by the Civil Code of Louisiana, art. 3238, that "the vendor of an immovable or slave only preserves his privilege on the object when he has caused to be duly recorded at the office for recording mortgages his act of sale." It appears from the recorder's certificate that this was never done in this case.

As Oliver J. Morgan had but one descendant by his daughter Ann, and several by his daughter Julia, he desired, as far as possible, to equalize their ultimate portions in the succession of his estate; but having two heirs, his daughter Julia and great-grandson Oliver H. Kellam, Jr., he had the power of disposing of only one-half of his estate, and the two heirs would be forced heirs for one-fourth each. (Civil Code, art. 1480.) He determined, therefore, that his great-grandson, Oliver H. Kellam, Jr., should have only the one-fourth which the law secured to him as forced heir, and that his daughter Julia should have the other three-fourths of his estate. To

insure this object, on the 9th of March, 1858, he executed an act of sale and donation to his daughter Julia, in which it was stated that for the purpose of paying her the sum of $67,495.70 which he owed her, and to give her three-fourths of his landed estate and to Oliver H. Kellam one-fourth, according to the estimates put upon the portions conveyed to each, he gave to her, by way of donation, certain described lands, composing the Wilton and Albion plantations, 3,047.86 acres, estimated at $50 per acre; and the Morgana and Westland plantations, estimated at from $45 to $10 per acre; the whole amounting to 11,477.79 acres, estimated at $304,254.22; and leaving the Melbourne plantation for his great-grandson, though there is no evidence that it was ever conveyed to him. The act of donation to Julia reserved the donor's usufruct for life, and declared that he was to retain possession of the property, with the revenues arising therefrom, till his death. And it was further declared that the act of donation, as [well as] delivery under it, was to take place and effect on the day of the donor's death. This act was signed by Oliver J. Morgan, Julia Morgan, and Julia's husband, Oliver T. Morgan, and was duly recorded in the recorder's office.

Such a donation, namely, to take effect at the death of the donor—so far at least as it is gratuitous—is a donation *mortis causa*. Article 1455 of the Civil Code of Louisiana defines a donation *mortis causa* to be an act to take effect when the donor shall no longer exist. And article 1563 declares that " no disposition *mortis causa* shall be made otherwise than by will and testament. All other form is abrogated." It is added that the name is of no importance, " provided that the act be clothed with the forms required for the validity of a testament, and the clauses it contains, or the manner in which it is made clearly establish that it is a disposition by will."

The donation in question had not the form of a will, and was never treated or proved as such; and by the last will of Oliver J. Morgan, executed but a few months before his death, he revoked all former wills made by him.

· If the document in question could be regarded as a donation *inter vivos*, it would still be void for another reason. By it the

donor reserves the usufruct of the land to himself, during his life; but by article 1520 of the Civil Code, treating of donations *inter vivos*, it is declared that "the donor may dispose for the advantage of another of the enjoyment or usufruct of the immovable given, but cannot reserve it for himself." It has been decided by the Supreme Court of Louisiana, in a number of cases, that a donation of land or of a slave, reserving the use to the donor for life, is void. *Lagrange* v. *Barré et al.*, 11 Robinson, 302; *Dawson* v. *Holbert*, 4 La. Ann. 36; *Haggerty* v. *Corri*, 5 Ann. 433; *Davis* v. *Carroll*, 11 Ann. 705; *Carmouche* v. *Carmouche*, 12 Ann. 721.

It may be urged that there was a consideration for the act, and that this prevented it from being void. But that consideration, as shown by the account contained in the act itself, was only $67,495.70 due to Julia (which the act was to satisfy), and $9,530.72 to be paid by her to Oliver H. Kellam; amounting in all to $77,026.42; whilst (by the same account) the value of the land conveyed by the act was $304,254.22. So that the consideration, or charge, in pecuniary estimation, was only one-fourth of the value of the whole property conveyed.

The exact account of the value of the lands, and of the rights of the heirs in reference thereto, as made up by Gen. Morgan himself, and embodied in the act of sale and donation to Julia, is as follows:

| | |
|---|---:|
| " Whole amount of community lands | $362,201 80 |
| " Lands acquired since the dissolution of the community | 75,760 00 |
| " Whole amount of land | $437,961 80 |
| " Deduct amount due to heirs arising from sale of community lands on the 18th of January, '58, to each $67,495.70 | 134,991 40 |
| " Balance divided by four | $302,970 40 |
| " Portion coming to Oliver H. Kellam | $75,742 60 |
| " Amount due him as above | 67,495 60 |
| " Entire interest of Oliver H. Kellam, in estimated value of lands | $143,238 20 |

"Three-fourths interest for Julia Morgan ........ $227,227 80
"Amount due as above........................ 67,495 70

"Entire interest of Julia Morgan................. $294,723 50

"Value of land conveyed in this deed to Julia
    Morgan.................................. $304,254 22
"Deduct entire interest ....................... 294,723 50

"Excess to be accounted as before stipulated...... $9,530 72."

This account, better than anything else, explains to the eye the motives and intent of Oliver J. Morgan in executing the act of sale and donation under consideration.

Now, the Civil Code, article 1510, divides donations *inter vivos* into three kinds—the purely gratuitous; the onerous, which is burthened with charges; and the remunerative, of which the object is to recompense services rendered. By article 1513 it is declared that "the rules peculiar to donations *inter vivos* do not apply to onerous and remunerative donations, except when the value of the object given exceeds by one-half that of the charges, or of the services."

In the present case the value of the object given exceeded, not merely by one-half, but by nearly three times that of the charge or consideration. The act is subject, therefore, to the incidents and conditions of a donation, and it is void by the express letter of the code, unless it can be sustained in part by virtue of its being a sale in part and a donation for the residue.

Pothier, writing under the old law, says that where the charges of an onerous donation are of less value than the thing given, for example, 2,000 livres, when the thing given has the value of 3,000 livres, the act will be of a mixed nature, a sale for two-thirds and a donation for one-third. Contrat de Vente, No. 613, 614. Zachariae, professing to give the modern French law under the code, states it substantially as the former law is stated by Pothier, and this would probably be the construction of the Civil Code of Louisiana. By this rule, the act in question would have been a sale for one-quarter of the land contained in it, and a donation for three-quarters; or, to speak with accuracy, the proportion would be as $77,026.42

to $227,227.80, the whole amount conveyed by the act being $304,254.22. If the old rule applies under the specific provisions of the code, the act was a good conveyance for the above proportion, and void as to the residue. As this matter (of validity in part) was not discussed before us it may come up for consideration by the Circuit Court, if called upon to instruct the master as to the ulterior disposition of the proceeds of any sales that may be made of the lands in controversy. As the representatives of Julia Morgan allowed the lands to be sold in 1869, they cannot claim any portion of them now specifically as lands; but they may be entitled in equity to such proportion of the proceeds, as the act of sale and donation was a sale and not a donation. The whole value of the lands was shown by the account to be $437,961.80. Of this amount the sum of $77,026.42, the only real consideration of the act, is about $17\frac{6}{10}$ per cent. Should all the lands be sold, the heirs of Julia Morgan may be entitled to this proportion of the proceeds free and clear of all debts. We do not now decide this question. For the present purpose, it is enough to say that it is very clear that the act of donation did not convey to Julia Morgan three-fourths of the land as claimed, and did not, in fact, convey to her even one-fifth of the land, if it conveyed any portion thereof.

But prior to these transactions, and probably not long after his wife's death, Oliver J. Morgan had placed his daughter Julia on the Westland, and (perhaps) on the Morgana plantation, and his grandson Oliver H. Kellam on Melbourne; the latter being succeeded by his widow, Melinda M. Kellam, and her minor son. The two families continued to occupy these portions of the property, respectively, until the sale made in 1869, and Julia Morgan and her representatives also succeeded to the possession of Wilton and Albion plantations after her father's death.

Whether Oliver J. Morgan had doubts of the validity of the donation made to his daughter, or not, he subsequently made a will by which he substantially confirmed to her the benefit which he intended by it. This will is dated May 1st, 1860, and the testator, after directing the payment of

all his debts and giving certain legacies, gave and directed as follows:

"Fourth. I give and bequeath unto my beloved daughter, Julia Morgan, one-half of all the residue of my estate, it being my intention thereby to give to her all that portion of my estate that I have a right to dispose of over and above the portions going to my forced heirs; and in the event of my said daughter Julia dying before I do, then it is my will and I do hereby bequeath unto her children, Narcissa Keene, Alexander C. Keene, William B. Keene, Morgan Keene, and Julia H. Morgan, or such of them as may be living at my death, the said one-half of my entire estate as above, it being my will that my said daughter shall have, inclusive of her forced heirship, three-fourths of my entire estate; but in the event that should she die before I do, then it is my will and the express intention of this testament that those of her children who may be living at my death shall have the said three-fourths of my estate.

"Fifth. I do hereby appoint and ordain Oliver T. Morgan, my nephew and son-in-law, executor of this my last will and testament, without requiring him to give security as such."

Oliver J. Morgan died October 4th, 1860, and his will was proved in the same month, and an inventory of his estate was made November 7th, in which his lands were appraised at $947,153.80, his slaves at $196,961, and his movable property at $38,200: total, $1,182,314.80.

Julia Morgan died prior to 1868, leaving a will of which her husband, Oliver T. Morgan, was executor. Melinda M. Kellam married John A. Buckner, by whom she had a daughter, Mollie Buckner. Oliver H. Kellam, Jr., died without issue, leaving his mother as his sole heir; and she soon after died, leaving her infant child, Mollie Buckner, her sole heir, who thus came to be the sole heir and representative of Ann Kellam.

Notwithstanding the large estate left by Oliver J. Morgan, he died considerably in debt, and owed, amongst others, to William Gay, the complainant, the amount before stated. The

coming on of the Civil War produced a great change in the value of the property; the slaves were a total loss, and, no doubt, much other property was injured or destroyed; but through the management of agents, and in other ways, considerable income was derived from the lands prior to the sale which took place in 1869. The crop of 1860 was over 2,500 bales of cotton, which must have produced at least $90,000 soon after Gen. Morgan's death. The sum of $21,870.68 was recovered from the government for cotton collected under the superintendence of army officers in 1862. The defendant Buckner, being examined as a witness, states that "Montague had charge of and cultivated Melbourne and Wilton in the year 1863, and H. B. Tebbetts had charge of some of the places during the years 1864 and 1865. In 1866 H. B. Tebbetts rented Wilton and Melbourne. Don't think he took Albion. He was to pay ten dollars per acre rent for all the land that he cultivated. Tebbetts promised Matt. F. Johnson and witness to pay ten dollars per acre for such land as he should cultivate on Melbourne and Wilton in 1866. The most of the land was overflowed on Melbourne in 1866, and witness don't know how much land was cultivated. Wilton was not overflowed in 1866, to his knowledge. Witness states that Tebbetts paid him $3,000 for the rent of Melbourne in 1866. Don't know how much he paid Matt. F. Johnson for Wilton, but that the rent was coming to Matt. F. Johnson from Tebbetts, according to the contract. Matt. F. Johnson and Samuel L. Chambliss cultivated Wilton in 1867 together; that is to say, a portion of the place. Charles Atkins cultivated a small portion of Melbourne in 1868, as witness' agent and manager. Very little was made on the place in 1868. Witness don't remember who cultivated Wilton and Albion in 1868."

Henry Goodrich, a planter, nephew of Oliver J. Morgan, states that he had charge of Wilton and Albion in behalf of the heirs from December, 1868, till April, 1873, and that in 1869 these plantations produced 800 or 900 bales of cotton; and about 700 bales in each of the years 1870, 1871, and 1872; and that during these four years the price of cotton averaged

about $60 per bale net. Dr. Devine, another witness, states that he, with two others, hired about 100 acres of Wilton in 1869, and they received about 30 bales apiece, or nearly a bale to the acre, and sold it for 27 to 30 cents per pound, or about $120 per bale. So that the annual product of Wilton and Albion alone in these years was not less than from $40,000 to $50,000, and that of Melbourne, half that amount; and whilst the result in the previous years, from the close of the war to the beginning of 1869 was undoubtedly less, it must have amounted to a considerable sum. Adding together the amount of the movable estate, the proceeds of the crop of 1860, the sum received from government, and the income realized from the landed estate down to 1869, the aggregate was probably not less than $200,000; all of which was first applicable to the payment of the debts due from the estate. But as the outside debts were not paid, the heirs or executors must have received it. The executor's final account is in evidence, and does not show that this money ever came into his hands; and the proof is very strong that he allowed the heirs to appropriate it. The amount which they thus appropriated, as well as the rental value of the plantations occupied by them before General Morgan's death, was properly chargeable against any claims that they had against the estate. How much they did receive nowhere appears. No credit is given therefor.

As to Julia Morgan's interest, it is not claimed that the estate was in debt to her; but it is claimed, and was claimed at the time of the sale in 1869, that her succession was entitled to three-fourths of the property by virtue of the act of donation made to her in 1858, and that this portion of the property was not subject to the debts of General Morgan, except the debt due to Buckner as tutor of his minor child. It was conceded to be subject to this debt, perhaps for the purpose of giving greater force to the sale, as there was evidently an understanding between the parties, as we shall hereafter see. But we think we have conclusively shown that the entire interest of Julia Morgan in the property of her father was subject, at his death, to all his debts, inasmuch as it was derived to her partly by last will, and partly as forced heir. If any portion of her

interest was not thus subject, it could only have been a small fraction at most—less than one-fifth of the whole property.

As to the Kellam interest, John A. Buckner, as tutor of his infant daughter (who represented Oliver H. Kellam, Jr., through the mother of both), claimed the entire sum of $67,495.50 and interest thereon from 1858, amounting at the time of the sale (January, 1869) to more than $100,000. At 5 per cent. interest it amounted to $104,618.33.

As to this claim, it may be remarked that as Oliver J. Morgan intended to pay to his daughter Julia what was due to her from her mother's estate by giving to her the lands which she succeeded to and received, so he evidently intended to pay to his great-grandson, Oliver H. Kellam, what was due to him on the same account, although, so far as the record discloses, he executed no act of donation for that purpose. But the careful statement in the act of donation to Julia, of the account between Oliver J. Morgan and the two heirs of his wife, in relation to the landed estate shows that the lands conveyed to Julia exceeded by $9,530.72 the three-fourths intended for her, including the $67,495.70 due to her from her mother's estate; and the donor directed that she should pay this sum of $9,530.72 to Oliver H. Kellam. This payment, according to the account, together with the remaining lands not given to Julia, but appropriated to Kellam, completely paid and satisfied the debt of $67,495.72 due to him, and the one-fourth to which he was entitled as forced heir. So that it is quite clear that Oliver J. Morgan regarded the debt as paid, with the exception of the small sum of $9,530.72 to be paid by Julia Morgan.

In other words, by means of the sale of the lands in the partition suit, and the subsequent distribution of his estate, Oliver J. Morgan intended that his great-grandson should receive just what, if no sale had been made, the law would have given him, and no more; and that Julia Morgan should receive the remainder; so that in reality, and in equity, there was no such thing as a debt due from him to his great-grandson, any more than to his daughter Julia. Whatever debt there might have been was paid by the property which he

received—except the said sum of $9,530.72, which was made a charge upon Julia's share.

This, as it seems to us, was clearly the intention and understanding of Oliver J. Morgan. Why should he have been indebted to his heirs for the land or any part of it, when they received every foot of it at his death, and had enjoyed a great deal of it in his life-time; he being entitled by law to the use of it during his life? The idea of an existing debt seems to have been an after-thought.

This supposed debt was claimed and represented to be a mortgage on the estate, and as having priority over all other debts. But we have seen that this claim was untenable, since Article 3238 of the Civil Code declares that the vendor of an immovable or slave only preserves his privilege on the object, by recording the act of sale at the office for recording mortgages, which was never done in this case. John A. Buckner, in his petition for the sale of the property, in December, 1868, makes the following allegation on the subject, namely: "That your petitioner, Buckner, tutor, is creditor by judgment of the district court in said parish [Carroll], as appears by reference in the suit in said court styled ———— v. ————, No. ——, on the docket as ————." The only judgment to which reference could have been made (so far as appears in the record) was the judgment in the partition suit instituted by Oliver J. Morgan in 1857. The judgment for partition was made November 7th, 1857, and the judgment for selling the lands was made December 2d, 1857. The certificate of sale, showing the amount bid for the lands, and the sums due to the heirs of Narcissa Deeson, was filed in the court on the 19th day of January, 1858. If this certificate of sale could have been called a judgment, it might have been a judicial mortgage; but it would have had no effect as such until recorded in the office of mortgages for the parish. Civil Code, Articles 3290, 3297, 3314, 3318. The only exception to this rule is made in favor of the legal mortgages of minors and interdicted and absent persons, on the property of their tutors, curators, &c., and of the wife on the property of her husband for her dotal rights. Civil Code, Arts. 3298, 3333. In the present case, neither the judgment in the parti-

tion suit, nor the certificate of sale, was ever recorded in the mortgage office; and Oliver J. Morgan was not the tutor or curator of Oliver H. Kellam, Jr., who was under the tutorship of his mother, Melinda M. Kellam. The claim, therefore, that the debt due from Oliver J. Morgan and his succession, to Oliver H. Kellam, Jr. (if any such debt existed), was a first lien upon the lands of the succession, secured by mortgage, and entitled to be first paid, was entirely unfounded. Yet this pretended debt, and its pretended priority over all other claims against the estate, and the mortgage by which it was declared to be secured, were used throughout the whole of the proceedings instituted in 1868 for the sale of the land, as potent factors in getting up the idea and impression that it was useless for any other creditors to interfere or make opposition, inasmuch as this privileged debt was sufficient to absorb the entire property, and that if anything at all should be conceded to the general creditors, it would be a mere matter of grace and generosity on the part of Mr. Buckner.

We next come to the proceedings for selling the property, commenced in December, 1868, and consummated in March, 1869.

First comes the petition, and as it is important, we state it in full. It was presented to the parish judge December 9th, 1868, and is as follows:

"To the Honorable the Judge of the Parish Court in and for the Parish of Carroll, State of Louisiana.

"The petition of John A. Buckner, who applies as natural tutor of his minor child, Mollie Buckner, issue of his marriage with Matilda M. Mason, widow of Oliver H. Kellam, and of Washington Jackson, and Dudley and Nelson and Ann B. Wilkins, all of which petitioners appear as creditors of the succession of Oliver J. Morgan, deceased, represent:

"That your petitioners are creditors of said estate; that your petitioner Buckner, tutor, is creditor by judgment of the district court in said parish, as appears by reference in the suit in said court styled          v.          , No.     , on the docket as          ; that your petitioners Washington Jackson

and Ann B. Wilkins have claims which have been acknowledged and ranked according to law.

"Petitioners show that said estate of O. J. Morgan is under administration·· in the hands of Oliver T. Morgan, executor; that said estate is possessed of landed property situated in this parish, but which is not yielding any revenues, and that the only means for paying the debts of said estate is by a sale of the property thereof. Wherefore petitioners pray that said O. T. Morgan, executor, may be ordered to sell the property of said estate for the purpose of paying the debts thereof; that an order may be granted for the sale of the property of said succession, as mentioned in the inventory, and for general relief, &c.

"And the said Oliver T. Morgan, executor of the last will and testament of Oliver J. Morgan, dec'd, appears and· intervenes in this proceeding and shows to your honorable court that said succession is indebted to the creditors aforesaid and various other creditors, and that as said estate is without any means or funds on hand in order to pay said. debts, a sale of said property is necessary.

"Wherefore, petitioners and intervenor pray that an order may be granted for the sale of the lands of said estate according to law, and that inventory and appraisement of said lands may be made; that a commission may issue for that purpose to the recorder of the parish, and that a writ of sale may issue to said executor, authorizing. him to make said sale, and for general relief in the premises.

"SPARROW & MONTGOMERY,
"Att'ys for Creditors.
"FERD. M. GOODRICH,
"Att'y for Executor."

The following order was thereupon made by the judge:

"The foregoing petition being considered, it is ordered, adjudged, and decreed that the prayer of the petition may be granted; that a commission to take an inventory be directed to the recorder of the parish; that the lands of said estate be sold in subdivisions in such manner as the said executor may direct, and in other respects according to law; and that such subdivisions be sold in block, and after making such sale the said execu-

tor shall file a tableaux of distribution, and that a commission issue to said executor, O. T. Morgan, to make such sale.

"Done and signed in chambers this the 9th day of December, A.D. 1868.

"C. A. DE FRANCE, *Parish Judge.*"

Thereupon a commission was issued to the recorder of the parish, who appointed Michael Gingery and W. D. Davis appraisers, and the appraisers made an inventory as follows:

1. Certain specified lots, comprising the Melbourne
   plantation, 2,171 acres, at $2.75............... $5,970 20
2. Certain lots, composing the Wilson and Albion
   plantations, 7,000 acres, at $2.75............. 19,250 00
3. Certain lots, composing Westland plantation, 5,040
   acres, at $2.75............................... 13,860 00
4. Certain lots, composing the Morgana plantation,
   1,500 acres, at $2.75......................... 4,125 00

   Total, 15,711 acres, at $2.75................ $43,205 25

This inventory was dated December, 1868.

Then followed a writ of sale, directed to the executor, Oliver T. Morgan, and dated December 18th, 1868, directing him to sell the said lots; terms, cash on the spot.

On the same day (Dec. 18th) the executor, according to his return, advertised the sale for the 19th of January, 1869; but before the day of sale arrived, the idea occurred to the parties, that Julia Morgan owned three-fourths of the property; and hence, on the 13th day of January, 1869, Oliver T. Morgan, as executor of the estate of Mrs. Julia Morgan, presented to the judge another petition, stating the fact of having presented the previous petition, and of the order of sale and advertisement, and then adding as follows:

"Your petitioner shows that said Julia Morgan claimed to be owner of three-fourths undivided interest in said land, although they are claimed in toto by the estate of said Oliver J. Morgan, and are offered for sale in order to pay his debts; that the debts due by him to the heirs of Oliver H. Kellam, who are also heirs of Mrs. Narcissa Morgan, deceased, late wife of said Oliver J.

Morgan, amounts to $137,000.00, being for one-fourth of the interest of said Mrs. Narcissa in the community existing between her and her said husband, which devolved to said heirs, and which community had been adjudicated to said Oliver J. Morgan at said sum ; that said sum of money, so due by said Oliver J. Morgan, is secured by legal mortgage on all of said land ; that in order that said property may be sold to the benefit of said estate, it is necessary that the interest of said Mrs. Julia Morgan may be sold ; that her said interest is under the incumbrance of said mortgage, existing against said Oliver J. Morgan, for the amount so due to the heirs of Oliver H. Kellam ; that for the purpose of paying the said sum the said heirs of Kellam, the interest of said Julia Morgan, deceased, should also be sold.

" Wherefore petitioners pray that an order for the sale of the interest of said Julia Morgan, deceased, in said land, may be made for the purpose of paying said debt, and that the proceeds of 'such sale may be paid by preference to the settlement thereof.

" That for this purpose, a writ of sale may issue to your petitioner, in his capacity of executor, to make such sale ; that such sale take place on the premises, at Wilton plantation, in block, and for general relief, &c.

" FERD. M. GOODRICH,
" Att'y for Executor."

And upon this petition the following order was granted:

" The foregoing petition being considered, it is ordered that the prayer of the petition be granted ; that the undivided interest of said Mrs. Julia Morgan, deceased, in said land, be sold at public sale, in order to pay said debt ; that said sale be made at the ' Wilton plantation ' for cash, in block, and that for this purpose a writ do issue to said executor, and that he be authorized to make said sale.

" Carroll Parish, La., January 13th, 1869.

" C. A. DE FRANCE, Parish Judge."

On the same day a writ of sale was issued in pursuance of this order.

The sale took place (as advertised) on the 19th day of January, 1869, and the lands were bid off as follows : The Melbourne plantation (2,171 acres), and the Wilton and Albion

plantations (7,000 acres), to John A. Buckner, for $3 per acre; The Westland plantation (5,040 acres), to J. W. Montgomery, for $3 per acre; and the Morgana plantation (1,500 acres), to Ferdinand M. Goodrich, for $3 per acre; total, $47,133. Deeds were given to the purchasers on the 23d of January, 1869. On the 26th separate petitions were filed by Buckner and Goodrich for monitions to be published and the sales to them homologated. Publication was accordingly made, and decrees of homologation were entered on the 2d of March, 1869.

This is an outline of what took place in the formal proceedings, and of what appears on paper. Several things outside and behind the mere forms are to be noticed, all tending to corroborate the conclusion, that this sale was projected and carried out, not for the purpose of paying the debts due to the creditors of the estate, but for the purpose of defeating their payment, and of preserving the estate for the benefit of the heirs.

The general scheme seems to have been, first, to circulate and give currency to the fact that a large indebtedness of the succession existed in favor of one of the heirs, sufficient in amount to absorb the entire estate, and secured by a mortgage giving it priority over all other claims; secondly, to depreciate the value of the property so that this supposed indebtedness would cover it all; thirdly, to put forward the claim of Julia Morgan to three-fourths of the property which, even, if not sustained, would show a complication of the title that would affect the salable value of the land; and fourthly, to procure a judicial sale by which the title might be cleared of all incumbrances, and the land might be distributed to the heirs according to their prior interests therein, free from all liability to the debts of the estate. If this scheme was not distinctly formed in the minds of the parties, it seems nevertheless to have been substantially carried into effect, with the added circumstance of providing a liberal compensation to the attorneys and counsel by whose aid it was accomplished.

The following is the account given by J. W. Montgomery of the manner in which the proceedings were initiated and carried out:

" He thinks it was in the fall of 1867 John A. Buckner called on him in the town of St. Joseph, where he (witness) was attending court, with a request that he should take charge of the collection of a claim against the estate of Oliver J. Morgan, which, with interest, amounted to about $100,000, and which he was attempting to collect as a representative of one of the minor heirs of the estate of Mrs. Oliver J. Morgan, and which claim he represented to be, and which witness knew to be, in judgment against Oliver J. Morgan during his lifetime, and secured by mortgage on all of his property and was really the only mortgage on it.

" When witness returned home he mentioned the proposition of Buckner to his law partner, General Edward Sparrow, who refused to go into it unless some arrangement was made by which something could be secured to some other creditors whom they represented. Witness himself was willing to take charge of Buckner's claim and give up the others, because the heirs whom Buckner represented had always been their client, and had a preferred claim by which witness thought he, the heir, could sweep the whole property ; but General Sparrow adhered to the proposition that something must be done for the other ordinary creditors whom their firm represented, and insisted on a compromise by which something should be secured to them. Afterwards it was agreed between counsel, Sparrow & Montgomery and Buckner, that the creditors should be protected to a certain extent. In the meantime F. M. Goodrich, attorney-at-law, representing certain creditors, also insisted that his clients should participate in such an arrangement. Subsequently Oliver T. Morgan, the executor of Oliver J. Morgan, insisted that there should be no preference among the ordinary creditors. If one was to come in, all were to come in ; that if Buckner was willing to make a concession in favor of the creditors represented by Sparrow & Montgomery, he did not see any reason why all the other creditors should not come in too. It was therefore agreed that other creditors, whom their law firm did not represent, should participate in any compromise which might be made in that respect. It was then agreed between Sparrow & Montgomery and Buckner that all the creditors of Judge Morgan might be permitted to bid upon the 5,040 acres before mentioned, without interference from his mortgage claim ; that he would not press his mortgage claim against the land that they should bid on, and that they might

bid on it free from interference on his part, though there was no contract or understanding that the creditors should absolutely buy it, but only had a right to bid on it so far as their attorneys might deem it to their interest.

"Witness had no further authority than this for buying in for the creditors. In the exercise of a fair discretion, witness thought he was doing the best for those which he represented, knowing that Buckner's claim was sufficient to sweep the whole property, and that whatever he might get for his clients under such an arrangement was just so much clear gain, and so F. M. Goodrich, attorney for other creditors, and Oliver T. Morgan, executor, thought. Accordingly, after Buckner had made his concession in this form, recognizing their right to bid on some of the property without interference from him or the claim he represented, they then, as his attorneys, and as attorneys for some of the other creditors whom they represented, presented a petition to the court asking for a sale of the property to pay debts against the estate of Oliver J. Morgan."

The witness added that, at the sale, by request of some of the representatives of the creditors, and by understanding between himself and his law partner, he, Montgomery, bid upon the 5,040 acres [Westland] for the creditors; and Buckner permitted him to buy in said property free from interference by his preferred claim, which "was the result of a pressure brought to bear upon Buckner;" and he holds said 5,040 acres for the benefit of such creditors as choose to come into the arrangement.

This statement is certainly a very remarkable one in view of all the facts of the case as they have been demonstrated by the evidence. The gravity with which the "compromise" was made between Buckner and the other creditors, after "the pressure brought to bear upon Buckner," is certainly interesting, when we recollect, what was clearly proved in the cause, that the Westland plantation, consisting of 5,040 acres, which was thus allowed to be bid off for the benefit of the other creditors, was, at the time, overflowed with water, and was estimated by several credible witnesses as worth not over a dollar and a quarter per acre, whilst the Wilton and Albion

plantations bought in by Buckner were worth probably $25 per acre, as will be shown more fully hereafter.

The first thing that was done after the presentation of the petition for a sale, was to appoint appraisers and have the property appraised; since no bid could be accepted which did not equal the appraised value of the property. Of course it was essential to the accomplishment of the supposed object of the parties that this appraised value should be as small as possible. It certainly was small enough—two dollars seventy-five cents per acre for each of the five plantations. They were all razeed down to one uniform value per acre, when the proof is overwhelming that they were very unequal in value. But the appraisement was a mere sham. The appraisers knew nothing about the plantations; they never saw them. They seem to have been picked up in the street and made their appraisement at guess, if not at the dictation of some of the parties interested. Their names were Davis and Gingery.

Ingram, one of the witnesses, who had been Gen. Morgan's overseer for several years, and now a planter himself, says he was well acquainted with Davis, who lived in West Carroll [the Morgan estate being in East Carroll]. He had the reputation of being somewhat of an idiot. His mental weakness was notorious in the country, and he was usually known by the name of "fool Davis." He also knew Michael Gingery. He resided in the western part of the parish, and was a man of very poor judgment—a carpenter. Witness would not feel safe in buying or selling by their judgment. He said further, that he would not think it a fair appraisement to appraise lands like Wilton, Albion, and Melbourne at five dollars per acre; that such lands were worth from eight to ten dollars per acre rent ever since the war. That before the war they could have been sold for $70 or $80 per acre; and that they were worth half as much since the war.

Davis himself, when examined as a witness, admits that he had no knowledge of the Morgan property except a general knowledge he had of all the swamp lands of Carroll Parish; that he had no knowledge of the condition of the Morgan property in 1869, except what he heard from others. He ad-

mits that he got his ideas of the value of property in the parish from the prices at which property was sold at succession and other public sales about the court-house.

A number of witnesses were examined as to the real value of the property; but, perhaps, none more competent tnan Mr. Henry Goodrich, a nephew of Gen. Morgan, and manager of his plantations from 1838 to 1843; and again manager for Matthew F. Johnson from 1868 to 1873. He thought the appraisement of the land in 1860 was rather high, and that about $500,000 would have been a fair valuation. He said that $3 dollars per acre, the price bid at the sale in January, 1869, was a low valuation; thought that the open lands in 1869 were worth $75 per acre, and the wood lands worth $15. He spoke particularly of the Wilton, Albion, Morgana, and Melbourne plantations—not of the Westland.

Mr. Le May, who had been a planter most of his life, testified that he had known the Morgan property since the year 1858, and in 1862 he managed the Westland plantation for the succession. He added:

"Westland plantation and the adjacent lands are subject to overflow and have been overflowed every year since the war. Said Westland plantation and adjacent lands are of little value, and witness says he could not estimate them to be worth more than one dollar and twenty-five cents per acre at present and ever since the war. He means to say that Westland plantation and adjacent lands belonging to the succession of Oliver J. Morgan he could not estimate higher than one dollar and twenty-five cents per acre.

"Wilton, Albion, Melbourne, and Morgana plantations are not included in this estimate. Westland plantation is established on the lands of the succession of Oliver J. Morgan furthest back from the Mississippi River, and the adjacent lands referred to are wild lands belonging to said succession. Says that Wilton, Albion, and Melbourne plantations have always been regarded as first-class plantations in the Parish of Carroll. Regards the lands embraced in said plantations as worth about seventy-five dollars per acre before the war, and twenty-five dollars now and since the

war, cash valuation. Such lands have been renting for from eight to ten dollars per acre since the war. . . .

" Witness having heard read to him the deposition of witness N. D. Ingram, corroborates in the main his testimony in regard to the location and description of the property, but does not appraise the lands since the war quite as high. Witness does not think that the appraisement of said Wilton, Albion, and Melbourne plantations at three (3) dollars per acre in 1868 was a fair valuation of said property. Witness considers that the same were worth in cash at that time twenty-five (25) dollars per acre.

" Witness was acquainted with Michael Gingery and W. D. Davis, who were the appraisers of said property. Gingery was a carpenter by trade, and resided in the western portion of the parish of Carroll, now West Carroll. . . . Witness considered Mr. Gingery to be an illiterate man, and not competent to fix a value on said property. Witness says he has known W. D. Davis as a citizen of the western portion of the Parish of Carroll, now West Carroll, for several years. Witness says he does not know of two more incompetent persons than Gingery and Davis to appraise property. Thinks that more incompetent persons could not have been found to make said appraisement in 1868."

Testimony of a different character was adduced, it is true, but in our judgment the result of the evidence is, that the appraisement, as we said before, was a mere sham. We have little doubt that the property of the estate which, in the aggregate, was bid off by Buckner, Goodrich, and Montgomery for $47,133, was worth at least five times that amount.

But there is no wonder that the property sold at a mere nominal price; there was no competition. The facts which were circulated, that Buckner had a preferred claim for over $100,000, and that three-fourths of the property belonged to Mrs. Julia Morgan or her heirs, were sufficient to drive away all bidders; and, as if this were not sufficient, one person at least, who had intended to bid on the property, was actually deterred from attending the sale by being told that it was to be a sale for the benefit of the heirs, or a family affair. Rhodes, one of the witnesses, says:

" That on the morning of the sale of the succession property of Oliver J. Morgan, in January, 1869, he and John Lynch went to the Wilton plantation, where the sale was to occur, expecting to attend the sale, and Lynch was calculating upon buying some of the property. When they reached Wilton they found no person present authorized to make the sale. Passed above said plantation and met Judge J. W. Montgomery and Ferdinand M. Goodrich, attorneys, going down to the sale. Major Lynch spoke of going back to attend the sale and questioned them as to the terms of the same. Mr. F. M. Goodrich replied to him that it was to be a sale for the benefit of the heirs, or a family affair. Lynch was informed that if he went back and purchased at the sale, he would get a long litigation on his hands, and they induced him not to attend the sale. . . . Witness is satisfied that if John Lynch had been let alone by Mr. Goodrich he would have attended the sale and would have bid something like the value of the property, and it would not have been sacrificed for the nominal price of three dollars per acre. Lynch, Ruggles & Co. paid about forty dollars per acre for the Illanara plantation, situated about four miles below Wilton, and it is far inferior to Wilton and Melbourne plantations in value per acre. Witness is satisfied that Lynch would have given more than twenty-five dollars per acre for Wilton, Albion, and Melbourne plantations had he attended the sale, and believed he could have obtained a valid title."

J. W. Montgomery was examined on the subject of the conversation between Lynch and Goodrich, to contradict Rhodes, and he says, " that F. M. Goodrich stated to Major Lynch . . . that the property was being sold to pay in part a large claim against it held by the family. This is what I remember of Goodrich's statements."

We do not see that the contradiction materially affects the result of the evidence.

Besides, the actual events which ensued, the proceedings at the sale itself, and what took place after the sale, go to prove most conclusively that it was intended as a mere family arrangement for securing the property, against the demands of the creditors, in the hands of the two branches of the family precisely as they had always held it,—except that for the sake

of appearances, the Westland plantation of 5,040 acres, then overflowed, and not worth more than a dollar and a quarter an acre, was bid off by Montgomery for the creditors ;—and Morgana, consisting of 1,500 acres, was given to Montgomery and Goodrich for their services, and was afterward sold by the latter for about $10,000. The Wilton and Albion plantations, although bid off by Buckner, never changed hands, but continued to remain, and still remain in the possession of Julia Morgan's heirs, whilst Buckner himself kept Melbourne and occupied it as before. This is conceded by all the parties, Buckner and Montgomery being fully examined on the subject and admitting the fact. The pretence that the sale was made to satisfy Buckner's claim of over $100,000 was nothing but a pretence ; when pressed on the subject, he admitted that, although the aggregate amount of his bids on the three plantations sold to him (which was $27,513) was legally a credit on the amount of the debt, yet that he did not claim the plantations held by the representatives of Julia Morgan, namely, Wilton and Albion. He was examined as a witness in 1878, nine years after the sale, and testified, amongst other things, as follows :

" The heirs of Julia Morgan have held possession of the land they had before the war ; and witness has held possession of the land he had before the war. Witness does not hold the property in common ; there is only a temporary division.

" Witness has held possession of Melbourne ever since the war, and the heirs of Julia Morgan have held possession of Wilton and Albion, except that the heirs recognized Oliver T. Morgan as executor, but he did not require of them any account of the rents and revenues.

" Witness says that his understanding was, at the time of the sale, in January, 1869, when he bought in the property for the heirs, that they were to receive their proportion of the land purchased in witness' name, and he was to retain his proportion.

" They were (the heirs of Julia Morgan) to take three-fourths of the land and witness one-fourth, and this understanding was had as to the exact amount in the division after the sale. There

was no conversation or agreement with the heirs, or any other parties, as to how the division should be made."

It is unnecessary to pursue the subject further in relation to the question of fraud. We are entirely satisfied that the sale was a sheer fraud as against the general creditors of the estate.

The next question is, whether the complainant is in a situation to contest the validity of the sale by the present suit. It is contended that he is concluded by the proceedings in the Probate Court of Carroll Parish, which is alleged to have had exclusive jurisdiction of the subject matter, and its decision is alleged to be conclusive against all the world, but especially against the complainant, who was a party to the proceedings.

The administration of General Morgan's succession undoubtedly properly belonged to the Probate Court of the Parish of Carroll, and, in a general sense, it is true that the decisions of that court in the matter of the succession are conclusive and binding, especially upon those who were parties. But this is not universally true. The most solemn transactions and judgments may, at the instance of the parties, be set aside or rendered inoperative for fraud. The fact of being a party does not estop a person from obtaining in a court of equity relief against fraud. It is generally parties that are the victims of fraud. The Court of Chancery is always open to hear complaints against it, whether committed *in pais* or in or by means of judicial proceedings. In such cases the court does not act as a court of review, nor does it inquire into any irregularities or errors of proceeding in another court; but it will scrutinize the conduct of the parties, and if it finds that they have been guilty of fraud in obtaining a judgment or decree, it will deprive them of the benefit of it, and of any inequitable advantage which they have derived under it. Story's Eq. Jur. §§ 1570–1573; Kerr on Fraud and Mistake, 352–353. This subject was discussed in *Gaines* v. *Fuentes*, 92 U. S. 10, and *Barrow* v. *Hunton*, 99 U. S. 80. In the latter case, speaking of the proceeding in the Louisiana practice to procure nullity of a judgment, we said: "If the proceeding is merely tantamount to the common law practice of moving to set aside a judgment for

irregularity, or to a writ of error, or to a bill of review on appeal, it would belong to the latter category " [that is a supplementary proceeding, connected with the original suit], " and the United States Court could not properly entertain jurisdiction of the case. . . . On the other hand, if the proceedings are tantamount to a bill in equity to set aside a decree for fraud in the obtaining thereof, then they constitute an original and independent proceeding; . . . a new case arising upon new facts, although having relation to the validity of an actual judgment or decree, &c."

These considerations apply with full force to the argument based on the monition proceedings which were resorted to after the sale for the purpose of procuring a homologation thereof as against all the world. The monition, as issued by and published under the direction of the Probate Court, called upon " all persons who could set up any right to the property, in consequence of any informalities in the orders and decrees under which the sale was made, or any irregularity or illegality in the appraisement or advertisement, or time and manner of sale, or of any other defect whatsoever, to show cause within thirty days why the sale should not be homologated and confirmed."

In the case of *Jackson* v. *Ludeling*, 21 Wall. 616, we held that the judgment of confirmation, or homologation, on such a monition, has relation only to mistakes and omissions of the officers of the law, and not to the question whether the purchasers obtained their title by fraud or were trustees *mala fide* for others; and that such a judgment is conclusive of nothing but that there have been no fatal irregularities of form. The concluding remarks of the opinion in that case have a strong bearing upon the present. It is there said : " A sale may have been conducted legally in all its process and forms, and yet the purchaser may have been guilty of fraud, or may hold the property as a trustee. In this case the complainants rely upon no irregularity of proceeding, upon no absence of form. The forms of law were scrupulously observed. But they rely upon faithlessness to trusts and common obligations, upon combinations against the policy of the law and fraudulent, and upon confederate and successful efforts to deprive them wrongfully

of property in which they had a large interest, for the benefit of persons in whom they had a right to place confidence. Homo-logation is no obstacle to such a claim." In our judgment it is equally no obstacle to the claim of the complainant in the case before us. The same observation may be made with regard to the proceedings had in reference to the executor's final account and discharge.

Had the question of fraud been before the Probate Court in any of these proceedings, and had the complainant been apprised of them, the case might have been different. This court would not try over again a case already tried, nor permit the complainant to litigate matters which he had notice of, and which he had an opportunity to litigate in the probate proceedings. But one of the grounds of complaint made by the bill is, that the very attorneys whom he had employed to secure his claim acted as attorney for the succession and heirs, and conducted the proceedings for the sale, and participated as active parties therein, without giving him any notice of what was being done. These allegations were substantially proven. It was shown that Gay, the complainant, resided in Louisville, Kentucky; that early in 1866 he sent his documents (the three bills of exchange described in his original bill), to Gen. Sparrow, of the firm of Sparrow & Montgomery (lawyers), in Louisiana, to secure his claim against Oliver J. Morgan's succession. The bills were presented by the attorney to the executor, Oliver T. Morgan, in April, 1866, and he endorsed and signed on each an acknowledgment that it was a just claim against the succession, to be paid in due course of administration; and thereupon they were submitted to the probate judge, who endorsed on each bill an order that it be ranked as a just claim, to be paid in due course of administration according to law. The bills remained in the hands of Sparrow & Montgomery until the commencement of the proceedings for sale (or about that time). Buckner having applied to them to conduct these proceedings, the farce (for it seems to us nothing but a farce) of making a compromise with the creditors took place in Sparrow & Montgomery's office, and the claims which they held against the estate were handed over to other attorneys.

Montgomery, when examined as a witness, admitted that the bills of exchange belonging to Gay were handed over to Farrar, and did not pretend that Gay was ever consulted on the subject. When pressed for an answer on this point, he admitted that his partner, Gen. Sparrow, "did voluntarily and of his own accord put the claim in Farrar's hands." He further stated that this was only six or eight weeks before the day of sale, and that Farrar had the bills on the day of the adjudication, that is, the day of sale; and there is not the slightest proof to show that Gay had any notice of any of the proceedings. After having put himself, in his bill, upon want of notice, and after this evidence on the subject, drawn from one of the defendants, it was incumbent on the defendants to have shown, if they could, that he had notice.

It is alleged, however, that since the commencement of this suit, the judgment obtained by the complainant on the bills of exchange has been reversed by this court on writ of error, and that the claim on the original securities is prescribed.

It is true that the judgment was reversed in March, 1874; and that the complainant, by leave of the court below, filed an amended bill setting forth the acknowledgment and recognition of the original bills of exchange, and relying on these evidences of his debt, thus sanctioned, instead of the judgment. This raises a question of law, whether a debt thus presented to and acknowledged by the executor, and ranked by the judge of probate, is subject to prescription like ordinary demands.

By the Code of Practice of Louisiana it is declared:

"Art. 984. No bearer of a claim of money against a succession administered by a curator appointed by a judge or by a testamentary executor shall commence an action against such succession before presenting his claim to the curator or executor.

"Art. 985. If such claim be liquidated and be acknowledged by the curator or testamentary executor or administrator, he shall write on the evidence of the claim, or on a paper which he shall annex to it, a declaration signed by him, and stating that he has no objection to the payment of the claim, after which the bearer of such claim shall submit it to the judge; that it may be ranked among the acknowledged debts of the succession."

Article 986 provides that if the claim is not liquidated, or is objected to by the curator, &c., the bearer may bring his action in the ordinary manner.

These articles show very conclusively that when a claim has been duly acknowledged by the executor, and ranked by the judge (as this was), no judgment on it is necessary. And such is the doctrine of the Supreme Court of Louisiana. In a late case, *Renshaw* v. *Stafford*, Executor, 30 La. Ann. 853, the subject was very fully discussed, and it was held that the acknowledgment of a succession debt suspends the prescription of it as long as the property of the succession remains in the hands of the executor under administration. The court say: "We think it manifest that the law never contemplated that a creditor whose debt has been formally acknowledged should bring a suit to establish his claim. The policy of the law discourages such proceeding; would punish it by inflicting the costs thereof on the creditor. True the law gives him, after a reasonable time, . . . a right to compel the administrator to account."

After referring to previous decisions, the court concludes as follows: "We therefore conclude that after a creditor of an estate has had his claim duly acknowledged by the administrator, the law does not contemplate any further proceeding on his part to establish it as against the estate. That, in principle, the administrator is his trustee, and holds in possession for his benefit the property of the estate which is the common pledge of the creditors."

From this authoritative exposition of the law of Louisiana, we think it clear that the plea of prescription cannot avail the defendants in this case. The bill was filed in January, 1872, just three years after the sale complained of, and within six years after the bills of exchange were acknowledged and ranked among the just debts of the succession. The bills could not have been prescribed before acknowledgment, because they came to maturity in January, 1861, and the Civil War interrupted prescription as against the complainant (a citizen of Kentucky), from April 27th, 1861, to April 2d, 1866. The acknowledgment and recognition in April, 1866, had the effect

to place the claim on the tableau of succession, and obviated the necessity of any other legal demand. Although this was sufficient to preserve the status of the debt free from prescription, yet there was another interruption by the legal demand made by the action which was brought in 1870, and which was in the course of prosecution until the reversal of the judgment by this court in 1874, if not longer. Such a legal demand interrupts prescription " whether the suit has been brought before a court of competent jurisdiction or not." Civil Code, Art. 3518 (3484). It is clear, therefore, that the debt was not prescribed when this suit was brought.

The defendants, however, place some reliance on the fact that the bill was not amended until March 28th, 1879, then first stating the fact that the claim was presented to the executor, and acknowledged and recognized, a period of more than five years after the reversal of the judgment. We do not regard this as material. The making of the bills of exchange was fully stated and set forth, and the bills described, in the original bill of complaint, and it was admitted and stated in the answer of the defendant, that the said claim of the complainant was duly acknowledged by the executor as a just claim against the estate. With such a statement in their own pleading they could hardly be heard to aver that the claim was prescribed. Besides, it is difficult to see how it could possibly be prescribed, any way, during the pendency of this suit, brought for the purpose of securing its payment.

It is not insisted, as it could not be, that the fraudulent sale is prescribed.

We are clearly of opinion that the complainant is not precluded from obtaining relief in the present suit.

Some technical points have been made in the case which we have examined and think untenable. One is that after the decease of Oliver T. Morgan, Matthew F. Johnson was substituted in his place in the suit as dative executor of the said Oliver T. Morgan, and not as dative executor of Oliver J. Morgan. He was in fact both, and the bill of revivor, as amended, distinctly states that subsequent to the filing of his plea, answer and demurrer, by Oliver T. Morgan, testamentary

executor of Oliver J. Morgan, in the year 1873, the said Oliver T. Morgan died; and that subsequent to his death, Matthew F. Johnson had been appointed dative testamentary executor of the last will of said Oliver J. Morgan; and that assets of said Oliver J. Morgan had come into said Johnson's hands in that capacity, and prays that he may answer and set forth whether any and what assets of said estate of Oliver J. Morgan had come into his hands, and for an account, &c. Upon this bill a subpœna was issued commanding the marshal to summon Matthew F. Johnson, dative testamentary executor of Oliver T. Morgan, to appear and answer the bill of revivor. Matthew F. Johnson did appear, entering his appearance as "dative testamentary executor of Oliver T. Morgan" to the bill of revivor, and to the amendments thereof, "wherein Stephen Waters, adminstrator of the succession of Wm. Gay, deceased, is complainant, and said Matthew F. Johnson and others are defendants." This appearance was entitled in the cause by its true title and number. The subpœna was mere process to bring the defendant into court. When he came into court and read the bill of revivor, he was informed that he was called upon to answer as dative executor of Oliver J. Morgan. This was sufficient. From that day until the cause came here on appeal, he defended the cause as representative of the estate of Oliver J. Morgan, and made no objection to the technical defect in the subpœna. The defect was cured, when he entered his appearance without raising the objection, and it is certainly too late to raise it now.

There is nothing else in the case, except the form of the decree, to which we deem it necessary to give our attention.

The decree made by the Circuit Court in the first place affirmed the debt due to the complainant, and, secondly, declared the sales made on the 19th of January, 1869, null and void as against the estate of William Gay, complainant, and directed that the lands be seized and sold by the marshal to satisfy the debt due to the estate of Gay, with interest and costs. We think that the latter part of the decree ought to be modified. The bill was filed by William Gay "in behalf

of himself and of all others, creditors of Oliver J. Morgan, . . . who shall come in and seek relief by and contribute to the expense of this suit." In other words, it is a creditor's bill filed on behalf of the complainant and of all other creditors that choose to come in and share the expenses, for the purpose of securing the due administration and application of a trust fund, namely, the estate belonging to the succession of Oliver J. Morgan, deceased. On such a bill it is the usual and correct course to open a reference in the master's office and to give other creditors, having valid claims against the fund, an opportunity to come in and have the benefit of the decree. In our judgment, therefore, the decree should be modified so as to declare and direct as follows, that is to say:

I. That the estate of said Oliver J. Morgan, deceased, herein represented by Matthew F. Johnson, dative executor of the last will of said Oliver J. Morgan, is indebted to the estate of said William Gay, deceased, herein represented by Stephenson Waters, administrator, in the sum of $33,250, with interest at five per cent. per annum until final payment on $13,000 from the 10th of January, 1861; on $10,250 from the 16th of January, 1861, and on $10,000 from the 28th of January, 1861, and for all costs of this suit.

II. That the sales of the lands of said estate of Oliver J. Morgan, adjudicated in parcels and subdivisions on the 19th of January, 1869, to John A. Buckner, J. West Montgomery, agent, and Ferdinand M. Goodrich, respectively, and conveyed to them respectively by Oliver T. Morgan, executor, by notarial acts passed before D. C. Jenkins, notary public, on the 23d of January, 1869, and recorded in the office of the parish recorder of the parish of Carroll, in notarial book N, at folios 212, 213, and 214, be declared null and void as against the estate of the said William Gay, complainant herein, and against the other creditors of said estate of Oliver J. Morgan, deceased; and that it be referred to      , one of the masters of the court, to take and state an account of the assets belonging to said estate in the hands of said dative testamentary executor, Matthew F. Johnson; and that the said master be authorized to summon said Johnson to appear before him and

render account of said assets; and that said master give three months' public notice by advertisement in a newspaper published in the Parish of Carroll, and in a newspaper published in New Orleans, to all creditors of the said estate of Oliver J. Morgan, deceased, to appear before him, the said master, and establish their several debts.

III. If other sufficient available assets of said estate to pay the said debt be not found in the hands of said Johnson, dative executor as aforesaid, the said master is authorized and required to sell so much of said lands in proper parcels as may be necessary to pay and satisfy said debts; and the lands so sold shall be free and discharged of any lien, claim, or title arising from, or by reason of said sales so made on the 19th day of January, 1869. If the available assets and the proceeds of said lands should not be sufficient to pay all the debts of said estate established before said master, including the debt due to the complainant, there shall be a *pro rata* distribution thereof after the payment of all costs and expenses of the complainant, and of said reference and sale. The sale shall be advertised and proceeded in according to the laws of Louisiana in reference to succession sales.

IV. The said master may apply to the court from time to time for further directions, which are hereby reserved, especially as to the question whether the succession of Julia Morgan, deceased, is entitled to any portion, and what portion, of the proceeds arising from the sale of said lands by virtue of the act of sale and donation made to her by Oliver J. Morgan in 1858, so far as said act was a sale and not a donation.

It is further our opinion, and

*We order and adjudge that each party pay his and their own costs on this appeal, except the cost of printing the record, which shall be equally divided between the appellants and appellees.*