### BOYD v. NORTHERN PAC. RY. CO. et al.

#### (Circuit Court, E. D. Washington, E. D.   March 30, 1909.)

#### No. 1,252.

1. RAILROADS (§ 134*)—CONSTRUCTION OF LEASE—ASSUMPTION BY LESSEE OF INDEBTEDNESS OF LESSOR.

A provision of a lease of railroad property for a term of 999 years, to be maintained in good condition by the lessee, that the lessee should save the lessor harmless from suits of "any and all kinds whatsoever arising out of, or in any manner appertaining to or connected with, the maintenance, operation or management of said demised railways, premises." etc., cannot be construed to render the lessee liable for an indebtedness of the lessor for original construction of its road, then in suit and upon which a judgment was subsequently rendered, which would ignore the limitations therein and hold the lessee liable for all of the lessor's indebtedness.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 134.*]

2. CORPORATIONS (§ 445*)—CONVEYANCE OF CORPORATE PROPERTY—RIGHTS OF CREDITORS.

A transferee of all of the property of a corporation takes and holds the same subject to the rights of creditors of the transferring corporation which as to the property are unaffected by the transfer, but the transferee does not become personally liable to such creditors except where it has disposed of, misapplied, or converted the property in fraud of the rights of such creditors, in which case a court of equity may require an accounting.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 445.*]

3. RAILROADS (§ 134*)—LEASES—LIABILITY OF LESSEE TO CREDITORS OF LESSOR—CONVERSION OF ASSETS.

A railroad company leased for a long term the road and all of the property of another company, except material and supplies on hand which it purchased, and also acquired the ownership of all of the stock of the lessor company. It covenanted to keep the property in good condition, and to pay as rental the interest on an issue of bonds to be made by the lessor, a part of which were reserved to pay off a prior issue, and the remainder, comprising the greater part, were used by the lessee or for its benefit. The operation of the leased road was in fact profitable, and produced net earnings more than sufficient to pay the interest on the bonds; but the lessee so apportioned such earnings between its own and the leased line as to show a deficit, and, making default in the payment of interest, the mortgages were foreclosed and all of the property of the lessor sold. *Held,* that the conversion by the lessee of the bonds of the lessor and the earnings from its property was in fraud of the rights of a general creditor

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of the lessor, who had an equitable lien upon all its property, and rendered the lessee liable for a judgment recovered by him on his claim, which was less in amount than the property so converted.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 134.*]

4. RAILROADS (§ 30*) — REORGANIZATION OF RAILROAD COMPANY — LIABILITY FOR DEBTS OF ORIGINAL CORPORATION.

The Northern Pacific Railroad Company in 1888 leased all of the property of the Cœur d'Alene Railway & Navigation Company, consisting of a railroad line and equipment in Idaho, for 999 years, and also acquired the ownership of all its stock. It converted to its own use certain bonds of the lessor and net earnings of its property, which rendered it personally liable to complainant, who was a general creditor of the lessor, recovering final judgment against it in 1897. A creditors' suit and foreclosure suits were instituted against the Northern Pacific Railroad Company in 1893, which were consolidated and receivers appointed. Issues were joined, but no further action taken until 1896, when a reorganization scheme was perfected between a protective committee of the stockholders and the bondholders pursuant to which defendant the Northern Pacific Railway Company was organized, in which stock was issued to stockholders of the old company in exchange for their stock on payment of a small bonus in cash. A consent decree of foreclosure was then entered, and pursuant to the plan the mortgaged property was brought in by the new company, to which a large amount of the bonds had been transferred. Subsequently a supplemental bill was filed in the suit on behalf of certain general creditors, including the reorganized company, and on the same day a consent decree was entered under which unmortgaged lands of the mortgagor were sold and the proceeds distributed, the reorganized company receiving $1,200,000 as a dividend on account of unused bonds, etc. In the meantime the old company had made default in the payment of interest on the bonds of the Cœur d'Alene Railway & Navigation Company, and suits had been instituted to foreclose the mortgages in which the property of such company was sold and bought in by the Northern Pacific Railway Company, which had become the owner of practically all of the bonds. Complainant was then a general creditor only, and was not made a party to any of such suits, nor did he have actual notice of the supplemental bill, filed in Wisconsin, under which the unmortgaged property of the Northern Pacific Railroad Company was sold and the proceeds distributed. *Held,* that he was not bound by any of such proceedings, which, in so far as they deprived his debtors, the Cœur d'Alene Railway & Navigation Company and the Northern Pacific Railroad Company, of property on which he had an equitable lien, were in fraud of his rights; that since the stockholders of the latter company continued in interest as stockholders of the reorganized company, and also as such received the benefit of the unmortgaged property of the old company to the extent of over $1,000,000, the Northern Pacific Railway Company was liable in equity for the payment of his judgment.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 30.*

Liabilities enforceable against reorganized corporations, see note to Armour v. Bement's Sons, 62 C. C. A. 147.

Rights and liabilities of stockholders of railroads on consolidation, see note to Bonner v. Terre Haute & T. R. Co., 81 C. C. A. 480.]

5. EQUITY (§ 82*)—LACHES—DELAY CAUSED BY ADVERSE PARTY.

The claim of complainant against the original debtor having been in continuous litigation in various suits and proceedings for many years, during most of which time it was being contested by the Northern Pacific Railroad Company or its successor, the Northern Pacific Railway Company, through both trial and appellate courts, complainant is not chargeable with laches because nearly 20 years elapsed after the first action was instituted

---

before he commenced suit to charge the latter company directly with liability, which suit he was not previously in a position to maintain.

[Ed. Note.—For other cases; see Equity, Cent. Dig. § 236; Dec. Dig. § 82.*]

In Equity.

Turner & Geraghty and R. L. Edmiston, for complainant.

Francis Lynde Stetson, Charles W. Bunn, Charles Donnelly, and Edward J. Cannon, for defendants.

WHITSON, District Judge. This suit arises out of an extremely complicated state of facts running over a long period of time, an understanding of which can only be arrived at through the tedious process of relating them in detail. It is a creditors' bill brought in the superior court of the state of Washington for the county of Spokane, but removed to this court as a cause arising under the laws of the United States. The defendant, the Northern Pacific Railway Company, is a corporation organized under the laws of Wisconsin, and will hereinafter be designated as the "Railway Company." The defendant, the Northern Pacific Railroad Company, was created by the act of Congress approved July 2, 1864, c. 217, 13 Stat. 365, and it will be referred to as the "Railroad Company," while the Cœur d'Alene Railway & Navigation Company, on account of whose indebtedness the grievances complained of arose, is a corporation organized under the laws of Montana, but doing business in Idaho, and it will be noticed as the "Navigation Company."

In 1886 the Navigation Company, while engaged in the construction of a narrow-gauge railroad in the then territory of Idaho, incurred indebtedness for work and materials upon a contract with William L. Spaulding in the sum of $23,675.85, and, this being unpaid, an action was commenced by Spaulding on March 27, 1887, in a court of that territory against it, which resulted in a judgment on April 25, 1896, for the sum claimed with accumulated interest, amounting to $36,584.95. This judgment was affirmed by the Supreme Court of the state on November 26, 1897 (Spaulding v. Cœur d'Alene Ry. & Nav. Co., 5 Idaho, 528, 51 Pac. 408), Idaho having in the meantime been admitted into the Union.

On May 3, 1898, Spaulding instituted a suit upon this judgment in a state court of Idaho against the Navigation Company, the Railroad Company, and the Railway Company, alleging that the property of the Navigation Company had come into the possession of the Railway Company in fraud of creditors, and praying that the judgment be declared a charge upon the property of the Navigation Company, then in the hands of the Railway Company, and for the appointment of a receiver with authority to sell the same and apply the proceeds to the payment thereof. A receiver was appointed in this suit on July 27, 1899. The defendants presented a petition for the removal of the cause to the United States Circuit Court for the District of Idaho, but the right to remove was denied by the state court, and thereupon the defendants filed a suit in the United States Circuit Court

to enjoin Spaulding from further prosecuting his suit in the state court. The injunction being denied, on May 20, 1898, an appeal was taken to the Circuit Court of Appeals, where the action of the circuit court was affirmed. 93 Fed. 286, 35 C. C. A. 295. It was sought to revise this judgment in the Supreme Court of the United States by writ of certiorari, but the petition was denied May 1, 1899. 174 U. S. 801, 19 Sup. Ct. 884, 43 L. Ed. 1187. The defendants then appealed from the action of the district court of the state of Idaho to the Supreme Court of the state, which, on November 21, 1899, reversed the judgment of the lower court holding that it was void. 6 Idaho, 638, 59 Pac. 426. In the meantime Boyd, the complainant here, claiming to be the owner of the judgment against the Navigation Company, having discovered that Spaulding had assigned it (for purposes not now material) to Willis Sweet, who had as attorney conducted the litigation on behalf of Spaulding, demanded that the same be assigned to him, and, being met with refusal, he instituted a suit by complaint filed December 20, 1898, in the district court of Idaho, at Moscow, against Spaulding and Sweet, which was at the petition of the defendants removed to the United States Circuit Court for the Northern Division of the District of Idaho, the suit resulting in a decree in that court on the 21st day of May, 1901, in favor of the complainant, establishing his right to such judgment and vesting in him the title and ownership thereof, with full and sole power to enforce and collect the same. From this judgment an appeal was taken to the Circuit Court of Appeals for the Ninth Circuit after the time limit had nearly expired, which was dismissed by that court. The dismissal left the original decree adjudging the complainant the owner of the judgment against the Navigation Company in full force and effect. Pending the litigation between this complainant and Spaulding and Sweet in relation to the ownership of the judgment, Spaulding on March 9, 1900, filed his petition or supplemental bill in intervention in the consolidated foreclosure suit begun by the Central Trust Company against the Navigation Company (hereinafter to be particularly mentioned), by which it was sought to have it decreed that the judgment was a charge upon the property of the Navigation Company then in possession of the Railway Company superior to the lien of the mortgages which had already gone to decree on foreclosure. This complainant appeared in the suit by petition, and set up that, while in fact he was the real party in interest and the owner of the judgment, Spaulding had denied his rights therein, and was proceeding by intervention without his authority and contrary to his interest, and praying that he be permitted to become a party for the purpose of setting up his own claim to the judgment. While the complaint in intervention, or supplemental bill, was dismissed on the ground that the Spaulding judgment was not entitled to priority over the mortgage liens, this complainant was granted the right to intervene therein, but no further steps were taken, and his petition remains on file in the state court without having been prosecuted, for the reason, it may be assumed, that the dismissal of the principal controversy left nothing upon which jurisdiction could be based to proceed upon a matter purely incidental to it.

Certain details must be recited, in view of the contention made by the defendants that complainant has not prosecuted his claim with diligence. In the original action, the demand of Spaulding being in dispute, the court ordered a resurvey and cross-section of the railroad constructed by the Navigation Company, as a means of ascertaining the amount due. This resulted in considerable delay through the difficulty experienced in procuring a competent engineer. During this interval, also, witnesses had scattered, and it was necessary to secure their attendance from Montana, Puget Sound, Oregon, and California, whereby the trial was further delayed. The judge to whom the case was first submitted was superseded by another before he had rendered judgment, the latter of whom, having heard the evidence and made a decision, died before he had given legal effect to his findings. This necessitated a retrial of the cause. About this time Attorney Sweet, who had been prosecuting the matter for Spaulding, was elected to Congress, and during his term the cause was permitted to slumber, for in the opinion of plaintiff his familiarity with the controversy made his services at least desirable, if not indispensable. Upon the return of Sweet after two years' absence in Congress, he was elected to the bench in Idaho to preside over the district where the action was pending, but he was of course disqualified from hearing the cause, and this resulted in further delay. At one time an execution was issued and returned nulla bona, and at another a steamer of the Navigation Company (the George A. Oakes) was levied on, but the sale was enjoined, while the cause was once delayed at the instance of the defendant. After Spaulding disputed complainant's ownership of the judgment, about three years were consumed in establishing his rights, which brought the case up to 1901, while notice of appeal delayed it until the fall of that year. During these delays the statute of limitations was running, and upon advice of counsel, who considered it unsafe to proceed before revivor, for that the expiration of the limitation period pending the litigation would bar a recovery, the complainant instituted a proceeding in the district court for Kootenai county, Idaho, against the Navigation Company, to revive the judgment, and this, upon petition of defendant, was removed to the Circuit Court of the United States for the District of Idaho, Northern Division, and there, on October 23, 1905, judgment was rendered in plaintiff's favor for $71,278.20, which is the original indebtedness contracted by the Navigation Company in 1886, with accumulated interest and costs. A writ of error from the Circuit Court of Appeals to reverse this judgment was dismissed by stipulation, but the prosecution of this suit was not thereby delayed. It is this indebtedness and the judgment last mentioned that the complainant seeks to recover in this suit instituted on the 20th day of September, 1906.

In the litigation between the Navigation Company and Spaulding the former was represented by counsel of the Railroad Company, after its connection with the property in 1888, not specially retained, but in pursuance of their general employment by that corporation. Every step taken by Spaulding and every action or proceeding instituted by him or subsequently by complainant, in the state courts of Idaho, in the United States Circuit Court, in the Circuit Court of Appeals, and

in the Supreme Court of the United States, to obtain relief against the Navigation Company, was resisted by the attorneys of the Railway and Railroad Companies in pursuance of their general duties as counsel, and without special employment for the particular matter in hand. And this continued until September 12, 1906, when it was stipulated by counsel of the Railway Company that the writ of error sued out by them against the judgment of revivor should be dismissed.

Going back now to those occurrences which affected the status of the property of the Navigation Company, pending the several proceedings which resulted in a final judgment against it in favor of complainant, it will be necessary to inquire of the various transactions, liens, transfers, and mortgage foreclosures against its property, as well as the relation to and control of the property by the Railroad and Railway Companies.

At the time Spaulding instituted his action the Navigation Company had already constructed in the territory of Idaho a narrow-gauge railroad from Burke to Old Mission, with a branch from Wallace toward Mullan, a total distance of 33 miles; and it was possessed of a steamboat line operating between Old Mission and Cœur d'Alene city. A mortgage to secure $360,000 of the bonds of the Navigation Company was placed upon the company's property in 1886. In August, 1888, Daniel C. Corbin, one of the incorporators, and who at the time owned or controlled a majority of the capital stock of the Navigation Company, entered into a contract with the Railroad Company, the terms of which may be summarized as follows:

First. Corbin was to cause a lease to be executed to the Railroad Company of all the property and franchises of the Navigation Company for a term of 999 years.

Second. The Railroad Company was to pay as rental the interest on an issue of bonds of the Navigation Company to an amount not to exceed $25,000 per mile, of which bonds $825,000 were to be issued on account of the 33 miles of railroad already constructed, but $360,-000 of which were to be retained by the trustee for redemption and payment of a like amount of the original issue under the prior mortgage of September 1, 1886, then outstanding. Until redemption of these outstanding bonds the Railroad Company was to pay the interest thereon and provide a sinking fund for the redemption of the whole of the new issue.

Third. The Railroad Company was to pay the Navigation Company, at the time of the execution of the lease and entering into possession of the demised properties, the sum of $20,500 for expenses incurred by the latter in making surveys between Wallace and the summit of the Bitter Root range of mountains, and in contesting the right of way with the Washington & Idaho Railroad Company, and for work done on said line; and the Railroad Company was to purchase from the Navigation Company all construction and operating material and supplies on hand at the time of taking possession, paying therefor the fair cost.

Fourth. In consideration of the execution of the lease and the guaranty by the Railroad Company, Corbin was to cause to be transferred to the Railroad Company at least 51 per cent. of the capital stock of

the Navigation Company, fully paid and nonassessable, and to cause the delivery of possession of the Navigation Company's property and franchises to the Railroad Company as soon as said issue of bonds could be prepared and executed, not later than October 1, 1888, and at and upon the execution of said lease and guaranty.

The lease, which included all the property of the corporation, was, as contemplated by the agreement with Corbin, duly executed on September 14, 1888, for the specified term of 999 years then next ensuing; but in addition to matters mentioned in the agreement there was reserved as rent the entire "net earnings" to be derived by the Railroad Company, that term being defined as surplus earnings of the property and appurtenances of the Navigation Company "which shall remain after all expenses of operating the said demised property and premises, and carrying on the business thereof, including all taxes and assessments, and payments of incumbrances, and the interest and sinking fund of the mortgage bonds," together with the expenses of repairing and replacing the demised railroads and premises and said steamboats, wharves, etc., which the Railroad Company agreed to keep and maintain in high condition. It was also provided in the lease, though not mentioned in the agreement, that, in addition to the rental already mentioned, a sum not exceeding $2,000 per annum should be paid by the Railroad Company to the Navigation Company to enable it to maintain its corporate organization and to defray the necessary expenses thereof.

The lease also contained the following:

"The party of the second part and its successors shall and will at all times during the existence of this lease, bear, and at its and their own proper cost and expense, pay and discharge any and all costs, expenses and charges, whatsoever, of operating, maintaining and transacting the business of said demised railways and premises, or in any manner connected with, arising out of, or appertaining to, the maintenance, business, operation or management thereof; and shall at all times save, keep harmless and indemnify the party of the first part, its successors and assigns, from and against any and all charges, cost, expenses, suits, damages, demands and claims of any and all kinds whatsoever arising out of, or in any manner appertaining to, or connected with, the maintenance, operation or management of the said demised railways, premises, and their appurtenances during the existence of this lease."

The mortgage contemplated by the lease was executed pursuant to its terms and dated the 1st day of September, 1888. Of the $825,000 of bonds thereby secured, $360,000 were reserved by the trustee for the retirement of the like amount issued under the mortgage of 1886, but those remaining, amounting to $465,000, were delivered to the Navigation Company. Who became the beneficiary will be reserved for future discussion. Fifty-one per cent. of the stock was transferred to the Railroad Company on September 18, 1888, and on October 1st of that year it went into possession under the lease, and so continued until its default in the terms thereof, hereinafter to receive more extended notice. In 1889 the Railroad Company concluded to build a standard-gauge railroad from Mullan eastwardly to the boundary line between Montana and Idaho to connect with the Northern Pacific system. This was a distance of 16½ miles, for the construction of which it advanced the money. By the terms of the mortgage, bonds to the extent of $25,000 per mile were to be issued for

each additional mile constructed, and pursuant to its terms $413,000 of the bonds provided for under the Navigation Company's mortgage of 1888 were issued to the Railroad Company, which amount, however, was less than the amount actually expended by something like a half million dollars. This brought the bonded indebtedness of the Navigation Company up to $878,000, exclusive of the $360,000 of outstanding bonds under the first mortgage, making a total of $1,238,000, for the payment of the interest upon which the Railroad Company stood as guarantor. On December 17, 1889, the Railroad Company bought 4,400 additional shares of the Navigation Company's stock of Corbin, and on December 24, 1889, 500 shares from Charles H. Head & Co., whereby it became the sole stockholder of that Company.

On August 15, 1893, P. B. Winston, the Farmers' Loan & Trust Company, and the copartnership of William C. Sheldon & Co., joining as complainants, filed in the Circuit Court of the United States for the Eastern District of Wisconsin a creditors' bill against the Railroad Company, praying the interposition of the court in administering the trust to the end that the obligations held by said complainants might be paid and the property preserved against sequestration by suits and attachments, which it was alleged would result in its dismemberment and destruction as a railroad system. To this bill the Railroad Company filed an answer upon the same day, admitting its allegations, and thereupon receivers were appointed to take possession of its property. Similar actions, ancillary in character, were instituted in the various districts through which the main line of railroad ran, including the district of Washington. There were six mortgages outstanding upon the property of the Railroad Company, and the interest due on the bonds secured by the general second mortgage of November, 1883, the general third mortgage of December, 1887, and the consolidated mortgage of December, 1889, having gone to default, the Farmers' Loan & Trust Company, as trustee, filed in the United States Circuit Court for the Eastern District of Wisconsin, on the 18th day of October, 1893, its original bill praying for their foreclosure. Thereupon the court consolidated the creditors' bill and the foreclosure suit, and the receivership created under the former was extended to the latter. Beyond filing similar bills in, and invoking the ancillary aid of, the several circuit courts within whose jurisdictions the property of the Railroad Company was situate, the record discloses no active proceedings in the consolidated suit from April 2, 1894, when the Railroad Company filed its demurrer therein, until the final decree, except that on December 28, 1893, the Railroad Company petitioned for the removal of the receivers, wherein complaint was made against the extravagant manner in which the property was being operated, and particularly as to the appointment of separate receivers for its 15 subsidiary companies. It was charged that their appointment was made by collusion and to prevent the control of the property passing out of the hands of Oakes, who was at the time president, and that the company should be in the hands of those "in whom the stockholders, whose coöperation is essential to the prompt and successful reorganization of the property, have full confidence"; and it was aver-

red "that it will be impossible to raise the large sums of money necessary to effect a reorganization of the company and restore it to a solvent condition while the management and control of the property is in the hands of those who have reduced it to bankruptcy." It was asserted that the receiver, Oakes, as president of the Railroad Company, had brought it into its then condition of insolvency by reason of mismanagement, was still the dominating factor in the control of the property and operation of the roads, and, in effect, that his connection with it would not inspire that confidence necessary to reorganization. The result of this petition is not material here.

While the Railroad Company, under the influences which dominated it at the time of the appointment of the receivers at the suit of Winston, and possibly even at the time of the institution of the foreclosure proceedings by the Farmers' Loan & Trust Company as trustee, and the consolidation of those suits, was in an attitude of friendliness toward those in power, it is apparent from the record, and particularly from the petition for the removal of the receivers who had theretofore been appointed, as well as the filing of the demurrer in the consolidated suit, that the stockholders were beginning to apprehend the probable wiping out of their stock by foreclosure, and to appreciate the result which might be expected if the suit should be vigorously prosecuted, for the fixed charges at this time amounted to something less than $11,000,000 per annum, while the net annual income was slightly in excess of $6,000,000. On account of the six mortgages of varying dates and rank upon the property of the Railroad Company, some of which were liens upon a part of the property, some upon other parts, and some general, as well as the complications arising by virtue of the 15 subsidiary companies with their several obligations and mortgage indebtedness, it became at once manifest that there was a necessity for preserving the property as a whole if the interest of all parties concerned was to be consulted. This could only be brought about by a reorganization which would conserve the property and preserve its integrity as a railroad system in the interest as well of the property as of the creditors and stockholders, and this became at once a problem in financiering worthy of the ingenuity afterwards displayed in solving it.

The interested parties, being thus confronted with a condition so complex, organized a committee of the holders of the general second mortgage, general third mortgage, and consolidated mortgage bonds on February 19, 1894. This committee having been put in control of a majority of the outstanding consolidated mortgage bonds and the general third mortgage bonds, but less than a majority of the general second mortgage bonds, secured the coöperation of J. P. Morgan & Co. of New York for devising a practical plan of reorganization, who, in connection with the Deutsche Bank of Berlin, E. D. Adams, chairman of the bondholders' committee, and the protective committee, of which Brayton Ives was chairman, formulated what was termed "the plan for independent reorganization of the property," of which the following is a summary:

The various properties, including all branch lines and subsidiary companies, were to be brought under direct ownership of one company;

the fixed charges were to be reduced to bring them within the net earnings under the receivership; ample provision was to be made for additional capital for the development of the property, and for greater facilities made necessary by the increasing business; the acquisition of the system was to be brought about by the organization of a new company, which was, at the discretion of the managers of the syndicate, to become the purchaser at foreclosure sales of the various properties of the Railroad Company, and this company was to be authorized to make a prior lien, 100-year, 4 per cent. $130,000,000 mortgage upon the main line, branches, terminals, etc., and a general lien, 150-year, 3 per cent. $60,000,000 mortgage to be subject to the prior lien mortgage. The capital stock of the new company was to be fixed at $155,000,000, to consist of $75,000,000 preferred and $80,000,-000 common stock. The bonds and stocks of the new company were to be distributed as follows:

### The $130,000,000 Mortgage.

To the retirement of the general first mortgage bonds.......... $ 41,879,000

To provide for the conversion, and, so far as necessary, for the sinking fund of the general first mortgage bonds............... 14,657,650

For the payment of receivers' certificates and equipment trust, and the conversion of the collateral trust notes and general second mortgage bonds..................................... 40,040,350

Total ....................................... $ 96,577,000

Reserved to provide at their maturity for an equal amount of bonds of the St. Paul & Northern Pacific Railroad Company... 8,423,000

Estimated amount to be reserved for new construction, betterments, equipment, etc., at $1,500,000 per annum.............. 25,000,000

Total ..................................... $130,000,000

### The $60,000,000 Mortgage.

For the conversion of the general third mortgage bonds, dividend certificates, and the consolidated mortgage and branch line bonds, under the plan..................................... 56,000,000

Estimated amount to be reserved under carefully guarded restrictions in the mortgage for new construction, betterments, equipment, etc......................................... 4,000,000

$ ᴠᴠ,000,000

### Preferred Stock, Amounting to $75,000,000.

For conversion and adjustment of various main line and branch line mortgage bonds, and the defaulted interest thereon, and other purposes in the plan................................ 72,500,000

Estimated amount which might be used for reorganization purposes or might be available as a treasury asset of the new company ................................................. 2,500,000

Total ....................................... $ 75,000,000

### Common Stock, Amounting to $80,000,000.

For purposes of reorganization, as provided in the plan........ 77,500,000

Estimated amount which might be used for reorganization purposes, or might be available as a treasury asset of the new company ................................................. 2,500,000

$ 80,000,000

Upon the completion of the reorganization, the managers in behalf of the syndicate were to deliver to each depositor of one share ($100) of preferred stock of the old company $50 in new preferred stock trust certificates and $50 in new common stock trust certificates in consideration of the payment of $10 per share, and to deliver to each depositor of $100 of old common stock one share of like par value of new common stock trust certificates in consideration of the payment of $15 per share.

While this plan was in process of incubation, the property of the Railroad Company was being operated under the receivership. Nearly 2½ years elapsed before the issues were made up in the consolidated cause. Outside of the controversy as to the personnel of the receivers and the interlocutory matters relating to the management of the property under the receivership, the proceedings appear to have been in a state of quiescence, for it was not until April 27, 1896, that the decree of foreclosure was entered. Adams, as chairman of the bondholders' committee, filed his answer on April 13th; the Railroad Company filed an answer on April 20th; Livingston and others on April 3d; Winston on April 27th; Sheldon and others on April 27th; the Railroad Company, its additional or supplemental answer on April 27th—all in the year 1896. The several answers admitted the allegations of the bill, and the issues thus made resulted in a consent decree, "no one opposing" being the language by which the consent was expressed. The decree, pursuant to the plan of reorganization, contained, among other things, this language:

"The purchaser of any parcel may satisfy and make good any part of his bid not required to be paid in cash by turning in to be canceled or credited, as hereinafter provided, any bond or coupon payable out of the proceeds of such parcel upon distribution of such proceeds; and such purchaser shall be credited therefor on account of his bid with such sums as would be payable on such bonds and coupons out of the purchase price if the same amount thereof had been paid in cash."

While the answers deny that a new company was formed for acquiring the properties of the Railroad Company in pursuance of the reorganization plan, the same purpose was accomplished by the purchase of the capital stock of the Superior & St. Croix Railroad Company, a Wisconsin corporation, the capital stock of which was increased to $155,000,000, and the name changed to the Northern Pacific Railway Company. In due course the property was sold under the decree of foreclosure, and the Railway Company became the purchaser. It bid the mortgaged property in for $12,500,000, but it took it subject to certain prior mortgages amounting to approximately $44,000,-000, from which it appears that the actual purchase price was about $56,500,000, exclusive of receivers' certificates and costs. The syndicate turned over to the Railway Company $3,500,000 in cash, which is apparently less than the amount realized from subscriptions of the stockholders of the Railroad Company, they having availed themselves of the opportunity for converting the stock of the old into that of the new company. In the purchase of the property bonds which had been deposited in pursuance of the reorganization agreement, and as authorized by the decree, were used in payment for the property sold under foreclosure. It was by this means, which will presently

have more detailed reference, that the reorganization was effected and the Railway Company came into the property of the Railroad Company.

Pending the receivership, the Railroad Company, having become insolvent, was unable to make good its guaranty of interest upon the bonds of the Navigation Company, which as to the mortgage of 1886 defaulted on September 1, 1893, and as to the mortgage of 1888 on October 1, 1893. Thereupon the receivers petitioned for leave to pay these installments of interest. The petition for that purpose recited that the gross earnings to the Railroad Company to and from the Cœur d'Alene Branch for the fiscal year ending June 30, 1893, amounted to $316,167.11, of which there was apportioned to the Railroad Company proper $229,226.12, and to the Cœur d'Alene Branch $86,-940.99; that the operating expenses and fixed charges of the Cœur d'Alene Branch for the same period amounted to $193,407.36, leaving a direct deficit from the operation of that road of $106,466.27 on its proportion of the earnings of $316,167.11, thereby showing a profit to the Railroad Company of $138,000. It was also set forth that for the fiscal year ending June 30, 1893, the earnings of this branch showed an increase of 25 per cent., which would show a net profit to the Railroad Company from the operation of it of $180,000 per annum over and above operating expenses, interest on the mortgage bonds, and other charges against it. On account of this manifest benefit to the Railroad Company, the receivers prayed for authority to pay the interest coupons maturing September 1, 1893, upon the $360,000 of bonds issued under the mortgage of September 1, 1886, and the semiannual interest upon the $878,000 which matured on the 1st day of October, 1893, under the mortgage of September 1, 1888; and this was based upon the advantage to the Railroad Company which would accrue by virtue of the continuance of the operation of the property under the arrangement already referred to. The prayer of the petition was granted, and the payment was made accordingly. But while the property of the Navigation Company was operated by the Railroad Company from the date it was taken over until August 15, 1893, ostensibly under the lease of 1888, the Railroad Company was the actual owner of it, holding as it did all the capital stock and being in possession of the property; and so it was considered, as is shown by the petition filed by the receivers Oakes, Rouse, and Payne on August 31, 1893, in the consolidated foreclosure suit, from which the following extract is taken:

" * * * And that (referring to the property of the Navigation Company), although it is operated in and by virtue of said indenture of lease above referred to, the demised property is, nevertheless, in reality part of the assets and property of the said defendant, the Northern Pacific Railroad Company, as all the stock, except a few shares necessary to qualify directors, are held and owned by said defendant."

The first nine months of the Railroad Company's control of this property, ending June 30, 1889—that is, from October 1, 1888, to June 30, 1889—the Navigation Company earned $130,269.01 in excess of operating expenses, taxes, and fixed charges, and, for the year next succeeding, $46,000.59. The year thereafter showed a deficit of

$36,381.19, and the year still following a deficit of $116,707.43, and the next year, namely, that ending June 30, 1893, a deficit of $84,049.-65. But this was largely bookkeeping, based upon the apportionment made by the Railroad Company of the earnings and expenses. '

The Central Trust Company of New York, as trustee, and Harry H. Trowbridge, as co-complainant, creditors of the Navigation Company, commenced a suit against it on October 10, 1893, in the United States Circuit Court for the District of Idaho, alleging the insolvency of the company, and its inability to earn operating expenses and fixed charges, reference being had to the first and second mortgages upon its property, whereupon receivers were appointed. Notwithstanding the above-mentioned interest payments upon the bonds of the Navigation Company by the receivers, the continuing deficiency of the earnings of the Railroad Company made it apparent that the course adopted was but a temporary expedient for the interest upon bonds thereafter defaulted, until, on August 24, 1895, the Central Trust Company as trustee commenced a suit in the same court for the foreclosure of the mortgage of September 1, 1888, and on May 25, 1896, it commenced a suit in the same court for the foreclosure of the mortgage of 1886. These suits were consolidated, and were pending at the time of the sale of the property of the Railroad Company under the decree of April 27, 1896. This consolidated suit went to final decree on October 16, 1896, and the property was sold thereunder on January 11, 1897. The Railway Company had, previous to that time, acquired $359,000 of the total of $360,000 of the first mortgage bonds, and had acquired the entire issue of $878,000 of the second mortgage bonds, the former having been paid for in cash at par, and the latter by its nonassessable preferred stock. The Railway Company bid in the property for the sum of $220,000, and the sale was confirmed January 23, 1897. The overplus—that is, the difference between the bid and the total of bonds held by it, amounting to $1,082,469.84—was presented by the Railway Company as a claim against the Railroad Company, and upon this claim it received as a dividend out of the unmortgaged assets remaining after the foreclosure against the Railroad Company the sum of $108,246.98. It will thus be seen that the Railway Company became the purchaser of the property of the Navigation Company in pursuance of the plan of reorganization; that it paid the purchase price for the property with bonds which it had acquired by purchase; but that it retired the second mortgage bonds by the issuance of its preferred stock.

While the manner in which the Railway Company came into possession of the railroads, terminals, and subsidiary companies, which were in fact a part of the general system of the Railroad Company, as well as the greater portion of the lands granted by Congress to aid in the construction of the latter's railroad lines, has already been related, it is worthy of mention that the parties to the litigation all joined in a motion to confirm the sale upon the report of the master, each waiving the time to file exceptions and agreeing that the matter might be at once determined.

But a part of the lands granted by Congress, together with certain other property, were not mortgaged, and thereupon the Farmers'

Loan & Trust Company, on May 25, 1896, professedly claiming as trustee, filed its supplemental bill in the court of original jurisdiction, which recited the various proceedings already set out in detail, and, in addition thereto, that there were certain lands of the Railroad Company situate in the states of Minnesota and North Dakota east of the Missouri river not included in the mortgages upon which the decree had been rendered. It was alleged that these lands were wholly insufficient to pay the debts of the Railroad Company, and that the petitioner had become a judgment creditor in virtue of its trusteeship as follows:

On May 14, 1896, in the sum of $2,133,501.38 upon two certain judgments in the Circuit Court of the United States for the District of Minnesota, and upon these in an action brought on the 26th day of May, 1896, in the court of original jurisdiction in Wisconsin, the defendant Railroad Company appearing, a judgment was rendered upon the same day for the sum of $2,137,430.09. Two certain judgments rendered in the Circuit Court of the United States for the District of North Dakota against the defendant on the 18th day of May, 1906, aggregating $1,383,736.30, upon which, on the 25th day of May, 1896, in an action brought thereon in the court of original jurisdiction in Wisconsin the defendant appearing, judgment was rendered upon the same day for $1,385,367.95. Upon a judgment rendered in favor of E. J. Conity, as administrator of the estate of John Harris, deceased, in the United States Circuit Court for the District of North Dakota, on October 24, 1894, for $3,000. A like judgment in the same court in favor of Andrew Mortenson for $7,000, both assigned to the petitioner. The prayer was that these lands in Minnesota and North Dakota and other unincumbered property be sequestered and sold, and that the proceeds be applied to the satisfaction of the claims of general creditors. To this petition the Railroad Company and the various parties to the consolidated cause immediately filed their answers, and thereupon on the same day the court adjudged that the equity was with the complainant, and the receivers were directed to sell the lands and property, which sale was made in due course and was subsequently confirmed, all the parties agreeing.

The Railway Company claiming as a holder of the overplus of bonds of the Railroad Company which had come into its possession through the plan of reorganization by deposit with the syndicate managers, and through the above-mentioned judgments, was adjudged to be a creditor of the Railroad Company in a sum in excess of $100,000,000. Out of the proceeds of the sale of this unincumbered property it received a dividend of $1,200,000.

The complainant seeks a decree declaring the judgment sued upon to be a liability of the Railroad Company, and he prays judgment against that company accordingly; that said indebtedness be declared a lien upon the property of the Railroad Company from the time of the acquisition by said company of the property of the Navigation Company, or, at least, that it be declared to be a lien since the insolvency of the Railroad Company; that the decree of foreclosure through which the Railway Company came into the properties of the Railroad Company be declared to have been fraudulent and void as to

the complainant, and ineffectual to free the property from the lien of the complainant's claim thereon; that it be decreed that the dividend of $108,216.98 paid to the Railway Company upon distribution of the proceeds of the unmortgaged assets of the Railroad Company was an unlawful and inequitable conversion by the Railway Company of the assets of the Railroad Company, and that the money so procured be treated as a trust fund in the hands of the Railway Company to be charged with the payment of the complainant's judgment; or, in the alternative, that the court declare the said amount to have been received by the Railway Company for the use of the Navigation Company, and that it be treated as a trust fund for the payment of the debts of the Navigation Company, and that the complainant's judgment be impressed upon said fund; that it be decreed that the Railway Company pay into the registry of the court the amount of the complainant's indebtedness, or, in default, that an order be made for the sale of all or so much of the property of the Railway Company as may be necessary to make the amount due the complainant; or, in the alternative, that the court appoint a receiver with the usual powers to take possession of the property within its jurisdiction and operate it until the amount due complainant be paid. Complainant also prays for general relief. Under the general prayer it may be assumed that he also seeks to hold the Railway Company liable for the $1,200,000 distributed from the unmortgaged assets, for such has been the contention, and, in view of the submission of that phase of the case and the discussion of it without objection, it also will be considered as within the general scope of the bill. Complainant's counsel have rested his right to relief upon three propositions:

First. Upon contract liability arising from the relation of the parties. This is based upon the language of the lease already noted. But the agreement of the Railroad Company to save the Navigation Company harmless from suits of "any and all kinds whatsoever arising out of, or in any manner appertaining to or connected with the maintenance, operation, or management of said demised railways, premises, etc.." placed a limitation upon the obligations for which it pledged itself. The contract must be construed, in so far as it relates to the terms of the lease, strictly considered as such, in view of the subject-matter with which the parties were dealing. The interpretation contended for would hold the Railroad Company liable for all the debts of the Navigation Company. We are not at liberty to adopt a construction which would amount to treating the qualifying words as wholly superfluous, but must seek to ascertain what was intended. That for which the complainant secured a judgment could not be chargeable to the maintenance of the road, for the amount had already been expended upon it; more properly it would have been designated as construction. It was not for operation from any standpoint, nor did it relate to the management of the property, for these must have been under the lease. The intention to assume antecedent indebtedness can only be extracted from the language used, by ignoring those things which the contracting parties saw fit to express. The words were apt for expressing the obligation of the lessee to preserve the property while in its possession from those lienable

charges which might affect the title, and were inapt for expressing existing indebtedness.

The facts here differ from those in Chicago, Milwaukee & St. Paul Railway Company v. Third National Bank of Chicago, 134 U. S. 276, 10 Sup. Ct. 550, 33 L. Ed. 900, in that the parties there were dealing with certain judgment liens and unliquidated demands against the railway company, while here the Railroad Company did not undertake to deal with existing indebtedness at all.

The second ground relied upon is that the transaction by which the Railroad Company purchased the whole of the stock and took possession of all of the property of the Navigation Company under the lease created an obligation on the part of the former to pay and discharge the debts of the latter. The defendants' counsel do not deny that the Railroad Company in virtue of the circumstances . stood in the same position as to creditors of the Navigation Company as though it had become the purchaser outright of the property. That it was regarded and treated by all parties in interest as a sale and transfer is abundantly justified by the record. Complainant's counsel invoke the doctrine of equity that the assets of a corporation constitute a trust fund for the payment of its creditors. This, of course, is not disputed, but a distinction is pointed out between the personal liability of a transferee in such a case and the right of a creditor to follow the property transferred. Thus the defendants' position is stated:

"When, on October 1, 1888, the Cœur d'Alene Company leased its property for 999 years to the Railroad Company, the rights of the creditors of the former company as against that property remained just what they were before. The Cœur d'Alene Company could not diminish or impair those rights by making the transfer, and the property remained subject to the claims of creditors upon it; and if at any time prior to 1893 the plaintiff had pressed his claim to judgment the property could have been sold (subject to mortgages upon it, but freed from the lease) to satisfy that judgment."

If counsel have appeared to dispute concerning the rule, it may be gathered from the briefs that there is no substantial controversy between them. Defendants' counsel admit that the transferee of the property of a corporation is liable to account to the creditors of the transferring company, but limits the remedy to the property transferred; while complainant's counsel apparently have not intended to be understood as claiming a liability for the payment of indebtedness beyond the assets taken over. But if they have been misunderstood in that regard, it must be held that there is no personal liability except where property has been disposed of, misapplied, or converted. The general trust doctrine would not permit of a more extended application, but the personal liability of one who fails to observe the duty imposed, when the assets of a corporation come into his hands, is abundantly sustained by authority. Angle v. Chicago, St. Paul, Minneapolis & Omaha Ry. Co., 151 U. S. 1, 27, 14 Sup. Ct. 240, 38 L. Ed. 55; Chicago, Milwaukee & St. Paul Ry. Co. v. Third National Bank of Chicago, 134 U. S. 276, 286, 10 Sup. Ct. 550, 33 L. Ed. 900; McVicker v. American Opera Co. (C. C.) 40 Fed. 861; Brum v. Merchants' Mutual Ins. Co. (C. C.) 16 Fed. 143; Hibernia Ins. Co. v. St. Louis & New Orleans Transp. Co. (C. C.) 10 Fed. 600; Thompson on Corporations, §§ 332, 6543.

A court of equity does not conclude its inquiry upon ascertaining that the property has passed beyond the control of the transferee, but will follow the fund in the enforcement of the trust fund theory. Chicago, Milwaukee & St. Paul Ry. Co. v. Third National Bank of Chicago, page 286 of 134 U. S., page 550 of 10 Sup. Ct. (33 L. Ed. 900); Pomeroy's Equity Jurisprudence (3d Ed.) vol. 3, § 1048; Thompson on Corporations, § 2957.

Applying the principle here, in order that there may be a liability on the part of the Railroad Company to pay the complainant's judgment against the Navigation Company, it must appear that the Railroad Company came into the possession of assets which the complainant could have made available to the satisfaction of his judgment, and, if not now possessed of them, that they have been wrongfully disposed of and in fraud of his rights.

With these propositions in view, the nature of the transaction between the Navigation Company and the Railroad Company will be inquired of.

We have seen that Mr. Corbin at the time that the lease was executed was in control of the property and stock of the Navigation Company, but it is necessary to scrutinize the transaction at this point. Remembering that the Railroad Company acquired all of the stock of the Navigation Company and that it went into control under a lease, it must account for the assets which it took over; for to those assets the complainant had a right to look for the satisfaction of his judgment. Speaking of the $165,000 of bonds, Mr. Corbin testified as follows:

"Q. If these bonds were issued during the time that you remained as president, did you or your associates derive any advantage from them in any way? A. I should say not. Q. You received none of this bond issue? A. We received no bonds. I am quite sure we did not. I do not remember that we did. My recollection is we received so much cash."

Referring to the second mortgage given to secure these bonds, he said:

"It could not be for our benefit, because we were wholly out of it, entirely, and turned over our stock, simply turning over the stock, practically turning over the property and receiving our money."

Again:

"Q. You say you and your associates received no benefit from this mortgage unless it was raised to pay you part of the purchase price? A. No, I should think not. I presume it was used, probably used to pay us, I presume. I know we got our money. Q. But you are certain that you did not receive the bonds, but that you received the money as your compensation? A. I do not think we received any bonds, unless possibly we might have received bonds with an agreement for somebody to take them off our hands and pay us the money, because I never had any bonds. Q. You do not remember having any of these bonds? A. If they ever came into my hands at all, they just passed through my hands. I never had any; I am quite sure of that."

Mr. Martin, in testifying on behalf of the defendants relating to the same matter, said in answer to an inquiry as to who got the $165,000 of bonds:

"A. I suppose the promoters of that enterprise did. Q. That is, Mr. Corbin and his associates? A. Yes, sir; his rights and so on were worth something.

Q. He did get that when he sold out, I suppose, as part of the consideration for the sale of the road? A. He and his associates certainly ought to get it. There were some other things; he had some surveys, I believe, that the Northern Pacific paid for, and also some stock of material that the Northern Pacific paid for."

It is true that the memory of Mr. Corbin was somewhat hazy concerning a transaction so long ago consummated, but his testimony is sufficiently convincing, corroborated as it is by that of Mr. Martin, to justify the conclusion that the proceeds went to pay Mr. Corbin for his stock, or that the Railroad Company otherwise received the benefit, particularly in the absence of any other explanation or theory presumably within the power of the defendants to make if the bonds were not in fact so applied. It appears that, if the bonds were actually delivered to the Navigation Company or to Mr. Corbin as president, it was purely a matter of form, for at the time his control was only nominal. Neither these bonds nor the proceeds were used to pay the obligations of the Navigation Company. They were either directly or indirectly applied to the benefit of the Railroad Company, and it is immaterial whether it used them to pay Mr Corbin for his stock or appropriated them to its own use in extensions or otherwise. The transfer included certain stock on hand not accounted for, but the value is not disclosed. This throws some light upon the nature of the transaction. The Railroad Company, being in full control of the property, apportioned the revenues as best suited its purposes, and decreased the net income by gradual diminution from year to year until the Navigation Company became insolvent through these diversions. The petition of the receivers for payment of interest on the mortgage bonds frankly disclosed this situation, and the evidence otherwise abundantly justifies the conclusion. This was well enough as between the corporations themselves, but it was a manifest fraud upon creditors, who had a right to subject these surplus revenues to the payment of their just claims. The Railroad Company, having in this manner dealt with the property, is accountable to the complainant as an existing creditor, for at the time it became insolvent he had a right to look to it for payment on account of the conversion of property which had come into its hands, the amount being largely in excess of his judgment. Creditors had an equitable lien upon the property of the Railroad Company, but there could be no impairment of priorities on this account; therefore creditors holding liens were entitled to rank general creditors. This case is bottomed upon the theory that the manner in which the lienholders pursued their remedy was in fraud of general creditors. Stockholders of an insolvent corporation cannot retain an interest in its property to the exclusion of creditors, for this is a concomitant of the trust fund theory, and it applies to lien and general creditors alike. Thus the rule was laid down by the Supreme Court:

"Assuming that foreclosure proceedings may be carried on to some extent at least in the interests and for the benefit of both mortgagee and mortgagor (that is, bondholder and stockholder), we observe that no such proceedings can be rightfully carried to consummation which recognize and preserve any interest in the stockholders without also recognizing and preserving the interests, not merely of the mortgagee, but of every creditor of the corpora-

tion. In other words, if the bondholder wishes to foreclose and exclude inferior lienholders or general unsecured creditors and stockholders, he may do so, but a foreclosure which attempts to preserve any interest or right of the mortgagor in the property after the sale must necessarily secure and preserve the prior rights of general creditors thereof. This is based upon the familiar rule that the stockholders' interest in the property is subordinate to the rights of creditors; first of secured, and then of unsecured creditors. And any arrangement of the parties by which the subordinate rights and interests of the stockholders are attempted to be secured at the expense of prior rights of either class of creditors comes within judicial denunciation." Louisville Trust Co. v. Louisville, etc., Ry. Co., 174 U. S. 674, 683, 19 Sup. Ct. 827, 43 L. Ed. 1130.

An examination of the foreclosure proceedings by which the property of the Railroad Company passed into the hands of the Railway Company is necessarily involved. First it is to be observed that this court cannot review the judgment of a court of co-ordinate jurisdiction. Irregularities, erroneous conclusions, wrong views of the law, cannot stand as the sanction for disregarding what was adjudicated. Here it becomes important to understand the powers of a court of equity to relieve against a judgment fraudulently obtained.

"A court of 'chancery is always open to hear complaints against fraud. whether committed in pais, or in or by means of judicial proceedings.'" Marshall v. Holmes, 141 U. S. 599, 12 Sup. Ct. 62, 35 L. Ed. 870, quoting from Johnson v. Waters, 111 U. S. 640, 667, 4 Sup. Ct. 619, 28 L. Ed. 547.

"In such cases, the court does not act as a court of review, nor does it inquire into any irregularities or errors of proceeding in another court; but it will scrutinize the conduct of the parties, and, if it finds that they have been guilty of fraud in obtaining a judgment or decree, it will deprive them of the benefit of it, and of any inequitable advantage which they have derived under it." Johnson v. Waters, supra.

But here the parties concealed nothing from the court, therefore no imposition was practiced. On the contrary, after a full and frank disclosure of the plan, it met with approbation. We must look elsewhere for the ground upon which complainant may stand. This leads to the inquiry whether the stockholders and bondholders of the Railroad Company so shaped the decree and conducted the proceedings that the former by virtue of stock ownership retained a beneficial interest in the property represented by stock in the new company, which was brought into being pursuant to the plan of reorganization. We thus pass to the final question, which must be considered in its double aspect, namely, whether the proceedings as conducted were in fraud of general nonparticipating creditors, and, if so, whether the complainant is bound by virtue of the jurisdiction of the court over the property and the notice to general creditors, coupled with the actual notice that there was a foreclosure, that receivers were appointed, that the property was operated under the receivership, that it was sold, that the purchaser went into possession, and thereafter the Railroad Company in its corporate capacity ceased to be an active and going concern. These will be examined in their order. On this branch it is indispensable that certain facts be briefly recounted.

The foreclosure suit, commenced October 18, 1893, supplemented as it was by bills subsequently filed which disclosed continuing and accruing defaults in the payment of interest, was permitted to rest upon the demurrer of the Railroad Company filed April 2, 1894, until

the final decree rendered April 27, 1896. The answers of the various parties defendant, all filed in the month of April, 1896, admitted the allegations of the original and supplemental bills. The answer of the Railroad Company, which generally admitted the allegations of the bill and supplemental bills, was filed April 20th, while the amended answer, consisting of specific admissions, was filed upon the day the decree was rendered. The issues thus made up must be considered as one cotemporaneous act, the dates of filing the respective answers having resulted, no doubt, from the exigencies of the situation and the necessity for conforming to methods of procedure. The reorganization committee was appointed on February 19, 1894, but the scheme proposed by it was not submitted until March 16, 1896, when it was finally promulgated. Up to the time that the reorganization plan was accepted, the Railroad Company was in an attitude of hostility. Upon its adoption all opposition was suddenly withdrawn, a consent decree was entered, and all became harmonious. Then it was that everybody consented to everything. These facts are significant as tending to disclose what was actually accomplished by the various transactions and proceedings which followed the adoption of the plan of reorganization. The mortgage indebtedness mentioned in the decree, including $18,510,653.13 accumulated interest, amounted to $152,335,155.13. The net income from the operation of the railroad properties under the receivership for the year 1895 amounted to $6,015,846.62, while the fixed charges were $10,905,690, but the average for the five years ending in June, 1896, was $7,801,645.78. Judge Jenkins in Paton et al. v. Northern Pacific Railroad Company et al. (C. C.) 85 Fed. 838, in an opinion filed July 22, 1896, denied the relief which the complainant sought in that case upon the basis of $7,800,000 as probably available by way of net revenues. Evidently there had been a considerable increase of net earnings for the year 1896 over prior years, and, in view of the circumstances, this amount, coming from one in a position to know, will be accepted as a close approximation to the earning capacity of the Railroad Company at that time. Taking these figures as a basis for calculation, we find that the net revenues under the receivership, at 4 per cent. per annum, the interest rate of the prior lien, 100-year, $130,000,000 mortgage, were paying interest upon a valuation of $195,000,000. Attention has been called to the statement, made in a brief in behalf of the Railway Company in a proceeding before the Interstate Commerce Commission, which fixed the cost of the property up to the time the Railway Company came into possession of it at $241,067,769.91. This, it is said, includes the cost of branch lines also, but even so, the disparity between cost and selling price is very large. While the cost is not necessarily the value of the property—for allowance must be made for depreciation— it is always pertinent as giving aid in making an estimate of value. The Railway Company bid the property in for $12,500,000, but it was subject to the liens of mortgages superior to those upon which the decree was based and the sale made, amounting in round numbers to $44,000,000, and to receivers' certificates, costs, etc., aggregating about $5,000,000, so that it may be fairly said that the property was acquired at an expenditure of about $61,500,000, while at the rate of

interest considered adequate at the time of reorganization the property was sufficient to pay the whole of the bonded indebtedness as well as the unsecured creditors, even in the then depressed state of the finances of the country, and upon revenues derived through the cumbersome, expensive, and inadequate methods necessarily adopted for conducting the property under the supervision of the court. And this is without regard to the value of the land grant, worth many millions of dollars, and $3,500,000 turned over to the Railway Company. An opportunity was afforded stockholders of the Railroad Company to surrender their stock and take in lieu thereof stock in the new company. True, this was coupled with a condition for the payment of certain specified sums, and it may have been designated as a subscription to stock, but the condition attached to the right of stockholders to subscribe was not open unless the old stock was surrendered for cancellation. It was manifestly the intention to dispose of or wipe out the stock of the old company, and, in carrying out the scheme, stockholders were to receive concessions. The proposal was addressed "To the Holders of the Bonds and Stocks Issued or Guaranteed by the Northern Pacific Railroad Company," and it concluded as follows:

"The plan has received the approval of the representatives of a majority of the bondholders of the three main line mortgages in process of foreclosure (the general second, general third and consolidated mortgages) and of other important interests affected by the terms of reorganization. It has also received the approval of the interests represented by the protective committee."

Brayton Ives, who signed as chairman of the "Protective Committee," was at this time president of the Railroad Company. It is pertinent to inquire what this committee was engaged in protecting. The president of the Railroad Company, in view of the fact that upon adversary proceedings its stockholders would have been entitled to no equity in the property, must have been protecting something in the way of stock. Clearly he was not protecting from the mortgage liens nor demanding an adjustment that would enable the company to resume control of its properties and continue their operation, for it had confessed the prayer of the bills in the suits pending against it, once generally and once specifically, and had thereby given its unqualified consent to a sale on foreclosure. Parties in interest solemnly agreed in writing that the property, which was taken over for something over $61,000,000, was "of the full value of $345,000,000, payable in fully paid, nonassessable stock and the prior lien and general lien bonds of the company, to be executed and delivered as hereinafter provided," etc. At this time the indebtedness of the Railroad Company, included expenses of the receivership and attendant costs, did not at the outside exceed $160,000,000. How much was advanced for rehabilitation of the property beyond the $3,500,000, which it is fair to assume came from the old stockholders, it is not necessary to discuss. It is sufficient to observe that the amount furnished was compensated for by stock and bonds of the new company. The testimony is replete with facts which indicate that the stockholders of the old company became the beneficiaries of the reorganization plan. The very term itself is indicative of this view. Aside from the concord which the acceptance of the reorganization plan seemed to magically produce, we

find it proposed and discussed in many phases. Note the following from the reorganization agreement:

"Holders of the bonds, collateral trust notes, dividend certificates, and of the preferred and common stock of the Railroad Company," etc., "may become parties to this plan and agreement by depositing their securities with the depositaries upon the terms and conditions specified in the plan and this agreement, or hereinafter defined, and within the periods which shall be fixed or limited by the managers."

In a letter written by Brayton Ives on December 13, 1893, to Hon. W. F. Sanders, at Helena, Mont., among other things, it was said:

"We have delayed aggressive action in the hope that some arrangement might be made by which we could have a voice in the management of the property."

In a circular issued by the board of directors, through Mr. Ives as president, in January, 1894, the statement was made that the Railroad Company owned every share of stock and every dollar of bonds of the 15 branch roads. In this circular it was also stated that there had been an increase in the expenses of operation. He further said:

"If properly protected, stockholders can secure equitable terms in any reorganization. Let the law and the terms of the bond be what they may, the fact is that an actual foreclosure of the consolidated mortgage and the sale of the road would involve so much time and trouble as to make it practically impossible. The question as to the land grant, the claims of holders of preferred stock and others of equal importance, make it essential that the rights of stockholders be not ignored."

Again:

"While recognizing the superior claims of the bonds, the directors propose to secure justice for the stock."

The requirement of the decree that the defendant pay the amount found due against it within 10 days was of course not fixed by the court in the exercise of its discretion in that regard, but in virtue of the consent of the parties, for the time was scarcely sufficient for assembling that amount if the defendant had been possessed of it.

It has been urged that the stock which the stockholders of the Railroad Company were permitted to subscribe for was not worth as much upon the market as they were required to pay, and the conclusion is drawn that they retained no beneficial interest in the property. This theory is wholly inconsistent with the elaborate plan adopted for reorganization, and it cannot be overlooked that the reorganization managers were themselves acquiring a large interest. It is a significant fact that the reduction of the interest to the highest rate upon which the reorganization was effected would, by slight concessions on the part of the stock and bond holders, have avoided the complex arrangement devised for acquiring the property. If the stockholders of the old company could have purchased stock in the new for less than the amounts paid in upon surrender of their stock, it is proper to infer that men so experienced in dealing with that class of securities would have done so rather than pursue the more extensive plan worked out by the reorganization committee. It is not to be supposed that they were treating the transaction upon a charitable basis, but rather that they regarded it as of substantial advantage to them-

selves to surrender their stock and pay the ten and fifteen dollars per share assessed as a condition to becoming stockholders in the new company. But whether the stock secured was valuable or not (although it proved to be immensely so, and the then existing revenues made it apparent that it would be), they did retain an interest. Its value does not enter into the consideration of the question; it is the retention of that interest which invalidates the transaction. The purpose throughout the proceedings, so often displayed, coupled with the manner in which it was finally consummated, lead irresistibly to the conclusion that that which was designated as a reorganization was meant to be a reorganization in fact, and not a foreclosure sale in the strict sense of the term. The protective committee, acting in the interest of stockholders of the Railroad Company, recommended the adoption of the plan, and we have seen that the protection of stockholders' interests was the object this committee had in view and which it was appointed to subserve. And thus it·was that finally, when it agreed to the plan and recommended it to stockholders and consented to the subscription to stock upon the basis outlined, all opposition to the decree of foreclosure was withdrawn, the decree itself being nothing beyond a pursuit of the methods adopted for carrying out the agreement reached by theretofore contending litigants. The foreclosure sale was made as a means of reorganizing, and the complainant's contention as to its purpose and effect in this regard is well sustained.

This is the theory of counsel for defendants: The bondholders and other lien creditors were necessarily compelled to protect themselves by bidding in the property. Sufficient sums of money for the purchase of like properties are rarely, if ever, available. The fact that shareholders were allowed to subscribe for stock was an independent transaction, and they should be treated, if I have apprehended counsel aright, as individuals who incidentally happened to hold stock of the Railroad Company. In view of the conditions, it is said that the Railway Company stands now upon the insolvency of the Railroad Company, the liens which it acquired, the foreclosure of those liens, and the necessity for placing the property upon some working basis.

But this is the shadow: However the transaction be obscured by legal phraseology, or the form be changed, the substance is that the conflicting interests desired to maintain the integrity of the property as a general railroad system. The difficulties in the way of this consummation arose out of the different rank of the liens, combined with the demands of stockholders. Upon a part of the system certain persons held first mortgage bonds, upon other parts certain other persons held mortgage bonds of like rank, and upon the whole there were outstanding general mortgage bonds, while 15 subsidiary companies, conducted by as many corporations, necessitated some kind of an accommodation to the complicated situation; and it was for this reason that the stockholders of the Railroad Company as such received a substantial benefit directly attributable to their ownership of stock. The argument based upon the theory that the syndicate subscribers had agreed to take the stock regardless of subscriptions by stockholders of the Railroad Company fails, in that it substitutes the form for the reality.

170 F.—51

It is not denied that if the mortgage liens had been foreclosed by an adversary proceeding in the usual way for the enforcement of such demands, and the property had been bidden in by the holders thereof and without connivance or collusion with stockholders, complainant would have no standing. His counsel plant themselves upon the proposition that, while lienholders may rest secure upon their rights and prosecute their prior liens to judgment, conduct a sale thereunder, and thereby cut off all general creditors and subsequent lienholders, permitting the stockholders to participate rendered the proceeding void as to those who were not parties or privies, and it is this principle which they would avail themselves of.

Counsel for defendants have met the contention in this way:

"When property of a corporation has been seized at the instance of creditors and administered by a court of equity having undoubted jurisdiction both of parties and subject-matter, may a general creditor of that corporation, by a subsequent independent proceeding, attack the judgments disposing of that property without submitting a particle of evidence to show that the court in rendering those judgments was not fully aware of every fact relied on as a ground for vacating them?"

The question as propounded must be answered in the negative. But did the court have jurisdiction of the parties? Undoubtedly those who, having knowledge of the facts, participated, or with such knowledge failed to participate, are bound; but since the law forbids that which was actually brought about, a creditor who was not a party and who was without notice may attack it unless the sequestration proceeding, being in rem, became a binding adjudication against him. And in deciding that question the conclusion is to be constantly borne in mind that a prohibited thing was done, a thing invalid as to creditors was accomplished, for we have seen that as to the assets of an insolvent corporation a general creditor cannot be precluded from sharing so long as they are sufficient to pay his demand, while the stockholders continue to hold a beneficial interest in the property through reorganization or otherwise. It must be accepted as a fact, for it is undisputed, that the complainant had no actual notice of the sequestration proceedings, of the existence of unmortgaged assets, or that the court was proceeding otherwise than in regular course for the foreclosure of existing mortgages. It is worthy of remark that the property sequestered was situate in the states of Minnesota and North Dakota, while the complainant lived in the state of Washington. Notices to creditors were not published in any newspaper in the city of Spokane, where the complainant resided, and those which were published were not called to his attention.

In Williams v. Gibbes et al., 17 How. 239, 255, 15 L. Ed. 135, the distribution of the property of an estate was under discussion. It was there held that an administrator may reasonably proceed to distribute among those who have established an apparent title, and, such proceedings having been taken upon notice by publication, a court will protect the administrator against any future claim. But as to the right of one entitled to share in the fund, the following was laid down as the rule:

"Now the principle is well settled, in respect to these proceedings in chancery for the distribution of a common fund among the several parties inter-

ested, either on the application of the trustee of the fund, the executor or administrator, legatee or next of kin, or on the application of any party in interest, that an absent party, who had no notice of the proceedings, and not guilty of willful laches or unreasonable neglect, will not be concluded by the decree of distribution from the assertion of his right by bill or petition against the trustee, executor, or administrator, or, in case they have distributed the fund in pursuance of an order of the court, against the distributees."

In the same case the following language from Davis v. Frowd, 1 Miln. & K. 200, was quoted with approval:

"But it is obvious that the notice given by advertisements may, and must in many cases, not reach the parties really entitled. They may be broad, and in a different part of the kingdom from that where the advertisements are published, or, from a multitude of circumstances, they may not see or hear of the advertisements, and it would be the height of injustice that the proceedings of the court, wisely adopted with a view to general convenience, should have the absolute effect of conclusively transferring the property of the true owners to one who has no right to it.

" * * * If a creditor does not happen to discover the proceedings in the court until after the distribution has been actually made, by the order of the court, amongst the parties having, by the master's report, an apparent title, although the court will protect the administrator, who has acted under the orders of the court, yet, upon a bill filed by this creditor against the parties to whom the property has been distributed, the court will, upon proof of no willful default on the part of such creditor, and no want of reasonable diligence on his part, compel the parties, defendants, to restore to the creditor that which of right belongs to him."

Conceding that a purchaser would take the property free from any claim which a creditor might make as against him, it does not follow that those who receive a fund may take refuge behind a principle so manifestly necessary for the peace of society and for upholding judicial decrees.

This distinction is pointed out in Daniell's Chancery Pleading & Practice (5th Ed.) vol. 2, star page 1206, in the following language:

"The distribution of property, under the decree of the court, amongst persons found by the master's report to be entitled, does not, however, conclude the rights of persons who have an equal or paramount title to those amongst whom the distribution has taken place; such persons are only precluded from taking the benefit of the decree under which the distribution has been made; and they may, notwithstanding that decree, file another bill against the persons who have taken the property under it, to compel them to refund. Such a suit, however, can only, after a distribution under a decree, be instituted against the parties who have partaken of the distribution. It cannot be instituted against the executor, or administrator, or other person who, having fairly represented everything to the court, has acted under its direction in distributing the fund, for the court will not permit a party who has acted in pursuance of its decree in distributing a fund to be afterwards charged for what he has done under its directions. * * *"

Continuing, it is said:

"A creditor, * * * who is entitled to the assets of a deceased debtor or testator, after payment of the debts, etc., may, after a decree in such a suit, to which he was not a party, institute another suit against the personal representative for an account of the assets."

We find the rule stated by the Supreme Court in the Matters of Howard, 9 Wall. 175, 184, 19 L. Ed. 634, in the following language:

"The general doctrine that, where there is a fund in court to be distributed among different claimants, a decree of distribution will not preclude a claim-

ant not embraced in its provisions, but having rights similar to those of other claimants who are thus embraced, from asserting by bill or petition his right to share in the fund, is established by numerous authorities, both in England and the United States."

Speaking of the effect of a decree upon one not a party, and referring to the authorities, it was further said in this case:

"None of them suggest even the proposition that the judgment or decree affirmed concludes the rights of third parties not before the court, or in any respect affects their rights. It would have been against all principle and all reason had they asserted anything of the kind. There is, indeed, a class of cases affecting the personal status of parties, in which a judgment necessarily binds the whole world; but it is not of these we are speaking. We refer to judgments at law, or decrees in chancery, affecting rights of parties to property. They bind only the parties before the court and those who stand in privity with them."

In Burke v. Short, 79 Fed. 6, 8, 24 C. C. A. 422, 424, it was said:

"Where there is a fund in court to be distributed among a class of creditors, a decree of distribution which seems to make no provision for some of the class will not ordinarily preclude any of the class having rights similar to those of other claimants from asserting by bill or petition their right to share in the fund."

In Public Works v. Columbia College, 17 Wall. 521, 21 L. Ed. 687, we find the following:

"The jurisdiction of a court of equity to reach the property of a debtor justly applicable to the payment of his debts, even when there is no specific lien on the property, is undoubted. * * * Unless the suit relate to the estate of a deceased person, the debt must be established by some judicial proceeding, and it must generally be shown that legal means for its collection have been exhausted."

See, also, Earl et al. v. McVeigh, 91 U. S. 503, 510, 23 L. Ed. 398. Those having the management of the reorganization, holding as they did the securities chargeable against the mortgaged property, did not content themselves with asserting their liens in reliance upon priority and their strictly legal rights, but seized upon the unmortgaged assets as well. When the Farmers' Loan & Trust Company filed its supplemental bill praying for the sequestration of those assets, the several parties to the foreclosure suit, who had already consented to the decree, immediately filed their respective answers, and the decree granting the prayer of the bill was entered upon the day of its filing. The record discloses no notice of the application; want of it was supplied by the immediate appearance of parties already before the court in the consolidated cause. The effect of this procedure as to the complainant has already been discussed, but the result calls for a detailed recapitulation.

The Railway Company had a surplus of $86,911,604.20 of the bonds of the Railroad Company not used in the purchase of the property at the foreclosure sale. It acquired other outstanding, unsecured claims by assignment amounting to $13,907,402.55, and at its suits thereon the Railroad Company appeared and confessed judgment. We thus have a total of $100,819,006.75. These claims were presented for allowance out of the fund realized from the sale of the unmortgaged assets, and it was upon this demand that it received a dividend of $1,200,000.

The dividend of $108,000, by virtue of a claim growing out of the ownership of $1,082,469.82 of the bonds of the Navigation Company, was from the same fund, $220,000 only of the outstanding bonds having been used to buy in the property of that company on foreclosure. This, of course, was an admission on the part of the Railway Company that the Navigation Company was a creditor of the Railroad Company, for the latter only bound itself for the payment of interest upon the bonds.

Defendants rely upon lis pendens. Stout v. Lye, 103 U. S. 66, 26 L. Ed. 428, and Hollins v. Brierfield Coal & Iron Co., 150 U. S. 371, 14 Sup. Ct. 127, 37 L. Ed. 1113, are cited. Those cases hold that a general creditor is not only an unnecessary but an improper party. This is the language of the Supreme Court in the case last mentioned:

"If they had been made parties when suit was begun, they could have done nothing by way of defense to the action until they had acquired some specific interest in the mortgaged property. As creditors at large they were powerless in respect to the foreclosure proceedings; but when they obtained their judgment, not before, they were in a position to contest in all legitimate ways the validity and extent of the superior lien which the bank asserted on the property in which by the judgment they had acquired a specific interest."

But the following, it is assumed, better expresses the views of counsel:

" * * * And on the further ground that the creditor represented in the foreclosure suit, not merely himself, but all parties who, like the Stouts, acquired any interest in the property since the commencement of the suit."

The fact that the complainant had not secured a final judgment against the Navigation Company until after the sale under foreclosure does not make him any less a creditor having a lien. Fogg v. St. L., H. & K. C. Co. (C. C.) 17 Fed. 871.

It has been held that the holders of bonds are not concluded by the action of the trustee in foreclosing the mortgage given to secure them, where the trustee exceeds the powers given by the trust deed. Moran v. Hagerman, 64 Fed. 495, 504, 12 C. C. A. 239.

If in such a case as this an insolvent corporation can conclude its creditors by consenting to the misapplication of a part of its property, stockholders the while retaining an interest therein themselves, or creditors who do appear can defeat the claims of those without notice, there remains nothing of the doctrine that the property constitutes a trust fund for their benefit, and it may be dealt with regardless of their rights.

The conclusion reached as to the real transaction seems to leave no equitable ground for the defendants to stand upon which will preclude the complainant, with his hostile demand, from asserting his rights as against the conversion of assets and the continuance in interest of stockholders. The books term such conduct a fraud in law, apparently distinguishing it from covinous acts and false representations of fact, but for practical purposes classifying it as subject to the same remedies. It is for this reason that the Railroad Company in its corporate capacity did not bind its creditors in the litigation. That part of the fund realized from the sale of unmortgaged assets which the Railway Company received by virtue of its ownership of the surplus of bonds

of the Navigation Company, the complainant was entitled to share in as a creditor of the Navigation Company. The $1,200,000 received as a general creditor of the Railroad Company complainant was entitled to share in, because he was a creditor of the Railroad Company through the conversion by it of the assets of the Navigation Company. But complainant is entitled to more. He has a lien upon the property of the Railroad Company which went into the hands of the Railway Company, for the reason that stock in the new company was exchanged for stock in the old, and this applies to the property of the Navigation Company also, which reached the Railway Company through the more circuitous route. When the Railroad Company converted assets of the Navigation Company to which the complainant had a right to look for payment of his debt, it became his debtor. The Railway Company, knowing this, availed itself 'of the debtorship of the Railroad Company to secure a dividend out of its assets, while the assets of the Navigation Company, which were liable for the complainant's judgment, came into its possession charged with the complainant's equities, based upon the ground that a general creditor as to an insolvent corporation is entitled to assert his demand against the property, the prevention of which, by whatever method, was regarded by Mr. Justice Brewer as subject to "judicial denunciation." Something over $1,000,000 was presented by general creditors at the time the fund was distributed, although the Railway Company held about 99 per cent. of the total. But these parties, of course, had notice. They had appeared and contested, and some of them at least had fought out the contention which the complainant now makes. The fact that the court having jurisdiction of the foreclosure decided the same question presented there is urged as binding here upon several grounds: First. That the decree was entered and approved by this court. If the record discloses that the decree concerning the unmortgaged property was ever so entered, it has not been discovered; naturally it would not have been. But if it was, the rule would equally apply. The right is not limited to the court from which the judgment emanates, and there would at least be as much reluctance to disturb the effect of the judgment of another court as for a court to interfere with its own judgment. Second. The holding of Judge Jenkins that the reorganization plan was not in fraud of creditors. This court takes a different view with diffidence, but it is reassured by the decision of the Supreme Court subsequently rendered in 174 U. S. 674, 19 Sup. Ct. 827, 43 L. Ed. 1130, supra, although it must be confessed that Railroad Company v. Howard, 7 Wall. 392, 19 L. Ed. 117, seems to have laid down the same doctrine. Third. That the complainant is bound by the jurisdiction of the circuit court of Wisconsin. The ground upon which complainant's bill is entertained here is that he was not a party, and therefore he is at liberty to wage the same contest which other creditors waged, and the argument relating to the conclusiveness of the judgment fails if the complainant is not bound by virtue of the jurisdiction of that court over the property.

The extraordinary circumstances which have attended the complainant's contest naturally suggest laches, and the defendants stoutly contend that, even though all other questions be resolved against them, the

attempt of the complainant to disturb existing conditions, in view of the changed and constantly changing situation through long lapse of time, ought not to meet with favor.

It has been said by the Supreme Court:

"Laches does not, like limitation, grow out of the mere passage of time, but it is founded upon the inequity of permitting the claim to be enforced—an inequity founded upon some change in the condition or relations of the property or the parties.
" * * * * The plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry." Galliher v. Cadwell, 145 U. S. 368, 12 Sup. Ct. 873, 36 L. Ed. 738.

See, also, Foster v. Mansfield, Coldwater & Lake Michigan Railroad Company, 146 U. S. 88, 13 Sup. Ct. 28, 36 L. Ed. 899.

So in Johnson v. West India Transit Company, 156 U. S. 647, 15 Sup. Ct. 520, 39 L. Ed. 556, relief was denied when seven years had elapsed from the date of sale and no satisfactory explanation of delay was given. There the trustee of the mortgage bonds defended by intervention.

The defense of laches is upheld because the disturbance of rights long acquiesced in will work injustice. There must be delay, a knowledge of the facts, or such indication as will import knowledge, and a condition which, if changed, will injuriously affect those who have relied upon silence as giving consent. Pomeroy's Equity Jurisprudence, vol. 5, §§ 19, 36.

Ordinarily a complainant after so many years would be remediless. Does this complainant fall within the rule that he has silently stood by and permitted others to be misled to their prejudice? Let us see what it is that imputes neglectful repose. The Railway Company, ever vigilant, watchful, and ready to contend, the while denying complainant's rights, resisted the revival of his judgment. As far back as 1898 its president and counsel had notice that it was the purpose of the complainant to claim a liability against it; with that notice, having contested, objected and fought to the last ditch, even appealing from the revivor of 1905, it now says that he has slept upon his rights; that he should have made known his contention long ago. Yet complainant could not successfully wage his contest without reviving his judgment. The expiration of the limitation period pending such a suit would have barred a recovery. And this defendant did know that the complainant looked to it for payment. The only thing that can be said is that it was not advised as to how he intended to sustain his contention. It is true that stockholders may not have known of this demand. But a corporation always represents its stockholders. Their want of notice cannot defeat a litigant, for notice to the corporation is notice to them. The rise or fall with the success or failure of the corporate entity is an incident of stock ownership.

This controversy was begun when Spaulding sought a judgment against the Navigation Company. The Railroad Company shortly after stepped into the Navigation Company's shoes and continued it; when the Railway Company stepped into the Railroad Company's shoes

it continued and still continues it. On one hand, we have the claim of Spaulding, of which Boyd was the beneficial owner. On the other, we have the Navigation Company conveying its property to the Railroad Company, the Railroad Company becoming liable for the debt, and, with this liability pending, becoming insolvent. The Railway Company comes into the property by committing a fraud in law, and then when complainant undertakes to revive the judgment, and having finally succeeded, notwithstanding obstructive tactics, he is met with the proposition that he has slumbered while defendants have been wide-awake. There was a time when Spaulding allowed the matter to drag during Sweet's term in Congress. But this was before the Railway Company had any connection with the property. The Railroad Company was at that time contesting the right to any judgment at all against the Navigation Company, and but for its interposition he would have had an adjudication long before. These conflictng interests have been in litigation all the time. Complainant has spent between twenty-five and thirty thousand dollars in prosecuting his claim. Perhaps it is meant that he did not seek this particular remedy. But he was prevented from pursuing any remedy looking to the merits of the matter by the pugnacious attitude of his adversaries. No doubt it was the intention—the record seems to disclose it, the employment of such eminent counsel would indicate it—to bring in all the creditors. It is fairly to be inferred that the proceedings were concluded upon the supposition that they were all before the court. Complainant was either omitted inadvertently or upon denial of liability. His judgment now doubly serves him, in that he is not chargeable with notice which will preclude him from the assertion of his rights; for that the defendants caused the delay; and it was also notice of his equities, which through all these years he has prosecuted over objection. The fact that the defendants so strenuously opposed the rendering of any judgment whatever tends strongly to the conviction that they had reasonable ground to apprehend a liability; not that the apprehension would create it, but it could not exist without notice. The contest which the defendants have ever waged, resting when the complainant rested, offering battle when he proceeded, coupled with the peculiar conditions, transfers, and succession of ownership, exclude the case from the familiar doctrine that unreasonable delay avoids the assertion of even a just claim. This is also a ground upon which the complainant can stand as against the contention that he might have filed his lien against the property of the Navigation Company under the statutes of Idaho, although the insufficiency of the remedy to reach the franchise of the Navigation Company is sufficient excuse in that regard.

I cannot bring myself to believe that one who prevents another from securing a right can be heard to say that such person has been guilty of neglect. If the stockholders were induced to make their investments without knowledge of this debt, now that they do know of it, manifestly, it must appear to them that they are enjoying the benefit of complainant's efforts, whose money went into the construction of the railroad which has since passed into the control of the company of which they are stockholders. It will therefore not be any breach of

the rules of equity to let them, out of the abundance of their profits, pay him for that which they are now enjoying.

Complainant must prevail, and these views will enable counsel to frame a decree in accordance therewith.